THE STATE OF OHIO, APPELLEE, *v*. PEREZ, APPELLANT.

[Cite as *State v. Perez,* 124 Ohio St.3d 122, 2009-Ohio-6179.]

*Criminal law — Aggravated murder — Death penalty upheld.*

(No. 2005-2364 — Submitted February 17, 2009 — Decided December 2, 2009.)

APPEAL from the Court of Common Pleas of Clark County, No. 03-CR-1010.

_____

CUPP, J.

{¶ 1}   On June 22, 2002, appellant Kerry Perez attempted to kill Clifford Conley during an aggravated robbery.  On March 5, 2003, Perez shot Ronald Johnson to death during an aggravated robbery.  Perez was convicted of the aggravated murder of Ronald Johnson and was sentenced to death.

## I.  Background and Facts

### A.  *The Beverage Oasis Robbery*

{¶ 2}   In 2002, Perez borrowed a double-barreled 12-gauge pump shotgun from George Remmer, telling Remmer he wanted to hunt with it. Perez never returned the gun.  On May 29, 2002, Perez's wife, Debra, bought a 20-gauge shotgun at a store in Springfield.

{¶ 3}   The Beverage Oasis was a drive-through liquor store in Springfield.  On June 22, 2002, at approximately 11:00 p.m., two masked men entered the Beverage Oasis while employees were closing up for the night.  One of these men was Perez; the other was his friend, Cecil Howard.  The manager saw both men raise a gun.  The other employees fled.

{¶ 4}   The owner of the Beverage Oasis, Clifford Conley, was in his office, but he could see what was going on in the store via security monitors. Conley watched as the two masked robbers came into the drive-through area of

the building.  When the employees fled, Perez ran out after them.  Conley called 911.  On the monitor, Conley saw Howard hitting the cash register with his gun.

{¶ 5}  Conley armed himself with a handgun, emerged from the office, and told Howard to "hold it."  Howard ignored him and began to flee.  Conley then fired two warning shots, but Howard fled the building through the rear drive-through entrance.  However, when he encountered a fence that blocked his escape route, Howard turned and raised his shotgun.

{¶ 6}  Conley fired at Howard.  Howard dropped the gun and fell to one knee.  Conley then started to walk out of the building toward Howard through the drive-through entrance, planning to pick up the dropped shotgun and detain Howard.

{¶ 7}  At this point, Perez returned.  He raised his gun and fired at Conley just as Conley ducked back inside the building.  Then Conley and Perez exchanged fire before Conley retreated.  Perez's shots hit the doorjamb beside the entrance.  The heaviest concentration of birdshot from Perez's fire struck the doorjamb about five feet above the ground.  Conley is six feet tall.

{¶ 8}  Howard limped over to Perez, leaving his shotgun behind.  Conley fired four times without carefully aiming, then pushed a button to close the overhead door of the drive-through entrance.  Perez helped his wounded partner walk away from the scene.

{¶ 9}  Meanwhile, a motorist had picked up three of the fleeing employees and had driven them two or three blocks away from the store.  Donald Little, a store manager, got out of the vehicle and called the police on his cell phone.

{¶ 10} While Little was on the phone, a car heading away from the Beverage Oasis pulled up.  A back-seat passenger thrust his head out the window, looked at Little, then dropped back into the car and told the driver to "go now."

Little could see his face clearly by the streetlight overhead. Little subsequently picked Howard from a photographic array as the person in the car.

{¶ 11} Springfield police investigators found the wounded robber's shotgun on the ground near the drive-through entrance. That gun turned out to be the one that George Remmer had loaned to Perez. A fingerprint on the shotgun was later identified as that of Cecil Howard. Investigators also found two spent shotgun shells at the scene.

{¶ 12} The day after the Beverage Oasis robbery, Perez told his teenage stepson, Robert "Robby" Smith, about the incident. Perez stated that he had been shot during the robbery and showed Robby the wounds on his arm. Perez told Robby that he had committed the robbery with Cecil Howard and that Howard had been "shot in the butt and the ankle." Perez described the shootout: "When Cecil got shot, he – Cecil dropped the gun and he [Perez] went back after him and grabbed him up and he shot back." When a television broadcast about the robbery showed a shotgun, Perez said, "There go[es] the one that was dropped at the scene."

### B. *The Do Drop Inn Robbery and the Murder of Ronald Johnson*

{¶ 13} On February 11, 2003, Debra Perez bought a Taurus .357 Magnum revolver from a Springfield pawnshop.

{¶ 14} The Do Drop Inn was a bar located at the corner of Tibbetts and Pleasant Streets in Springfield. On March 5, 2003, between 11:30 p.m. and midnight, two armed men wearing masks and dark clothing kicked in the side door and entered the bar.

{¶ 15} Five people were seated at the bar. The owner, Larry Delawder, was sitting at the end of the bar nearer the side door. Next to him on his left was Ronald Johnson, a customer. Three other customers, including Cindy DePriest, were seated at the bar. The robbers announced that a robbery was in progress and ordered the occupants of the bar not to move.

**{¶ 16}** Delawder and DePriest testified that when the robbers entered, they ordered the customers to place their hands on the bar. According to DePriest, the robbers also made the customers get down on the floor, get up, get down again, and get back up. They asked DePriest to come around to the other side of the bar and get money from the cash register.

**{¶ 17}** One of the robbers went behind the bar to get the money. The other one situated himself behind Delawder. The robber demanded money from Delawder, but he protested that all he had was some change. Johnson "turned one way or the other to look," and the robber shot him.

**{¶ 18}** Johnson immediately collapsed onto the floor. The shooter asked Johnson, "Did I hit you?" Johnson replied, "Yes, you hit me hard." After the shot, DePriest gave the cash to the other robber. He made her lie on the floor, and the robbers left.

**{¶ 19}** Delawder and the bar patrons tried to help Johnson, who was bleeding badly. But within a few minutes of the shooting, Johnson was unconscious, had no pulse, and had stopped breathing.

**{¶ 20}** An autopsy showed that the bullet had entered Johnson's back, punctured both his lungs, and severed his spinal column, killing him. The bullet was recovered from Johnson's chest and examined by the Ohio Bureau of Criminal Investigation and Identification. Its appearance was characteristic of a hollow-point bullet.

**{¶ 21}** On the day after the Do Drop Inn murder, Perez told Robby Smith, "I had to merc [i.e., kill] an MFer, last night." Perez claimed that the victim "called him the N word, and that's what caused him to shoot him. * * * Then [Perez] asked [the victim] * * * if he got hit; and the guy [said] * * * you got me good." The victim, Perez told Robby, was "[o]n his back gurgling blood, like blood coming out his mouth."

{¶ 22} On March 7, 2003, a local newspaper carried a front-page article about Johnson's murder. Perez called Debra and Robby into the room, showed them the article, and said, "I made the paper. * * * I made the front page." Perez also showed Robby the gun he had used, a chrome .357 Magnum revolver, remarking that it was "a nice gun" with "a lot of power." Perez stated that he had used hollow-point ammunition.

{¶ 23} Later that day, Perez, Debra, and Perez's daughter, Lindee Alspaugh, were watching a news broadcast about Johnson's murder. The broadcast stated that the victim had been shot in the back. Perez remarked, "[T]hey make the man look like a coward," and laughed.

{¶ 24} The next day, Perez, Debra, and Robby went to the Caesar's Creek flea market in Wilmington, where Debra exchanged the .357 Magnum Taurus purchased on February 11, 2003, for two 9 mm Hi-Point handguns.

{¶ 25} In August 2003, Perez was discussing the subject of robbery with John McGhee, an acquaintance. According to McGhee, Perez said "he could not be stopped" when committing a robbery and that anyone who resisted "would have to get dealt with."

*C. The Investigation*

{¶ 26} On October 20, 2003, Robby Smith told his guidance counselor about Perez's admission to the Do Drop Inn murder. The counselor contacted the Springfield police. After Robby told detectives about Perez's admission, the police questioned Debra. She agreed to cooperate with the investigation. Debra or Robby gave police three masks that were in Perez's closet or among his belongings.

{¶ 27} On October 24, 2003, Perez was being held in the Clark County jail on a charge unrelated to Johnson's murder. That day, he received a visit from his wife, Debra. Their conversation was recorded with Debra's consent.

{¶ 28} During the conversation, Debra expressed fear that she might be subject to criminal liability. Perez tried to reassure her: "We're the only ones that know." "There's only three people that know that. That's me, you, and Robby."

{¶ 29} He urged Debra to remain silent: "If anybody comes – you don't know nothing. * * * How can you know anything? Just stay strong, okay."

{¶ 30} On November 12, 2003, Debra visited Perez again, and again their conversation was recorded with Debra's consent. During this conversation, Debra again expressed fear of possible exposure to criminal liability. Perez again reassured her: "They don't have s* * *." "[T]here's no way to prove this * * * . [T]hey can't do it * * * ." He coached her on what to tell the police: "Well, the reason that you * * * got rid of the [gun] is because it was too big."

{¶ 31} Perez repeatedly expressed his determination never to confess, because he knew he would receive a severe sentence if he did:

{¶ 32} "If I go ahead and do that [confess], * * * then you know what happens right there. * * * I'm saying it's over with for me and you."

{¶ 33} "I ain't never gonna admit to [anything]. * * * In order for me to admit to that, I'm – I'm gone for life."

{¶ 34} "But I ain't trying to go do the * * * rest of my life for something when I ain't got to either."

{¶ 35} "You're gonna stick there throughout the whole shebang, huh? * * * 'Cause we're talkin' 30-some years probably. * * * If you go the other route. That's why I'm saying you got to be strong, baby. You gonna tell me you can stick around for 20 years?"

{¶ 36} "I mean what am I supposed to do, go in there and admit to this * * *?"

{¶ 37} "[A]re you understanding how much time that is? * * * A murder. * * * On top of a robbery. Then they want to know who was involved. * * * I

can't take my dude down with me either. * * * So who do I take down with me, [acquaintance] John McGhee?"

{¶ 38} On November 18, 2003, an X-ray taken pursuant to a search warrant revealed a metal fragment embedded in Cecil Howard's left hip or buttock area. A radiology physician who examined the X-ray and a photograph of a scar on Howard's left buttock concluded that both were consistent with a gunshot wound.

### D. Perez's Confession

{¶ 39} On the afternoon of November 12, 2003, Detective Daniel DeWine of the Springfield police department received a message stating that Perez wished to speak to detectives. DeWine and Detective Darwin Hicks brought Perez to police headquarters. Perez waived his *Miranda* rights, and the detectives proceeded to interrogate him. Perez volunteered that his wife had visited him that morning and had been concerned that she would be arrested because she had owned the Magnum.

{¶ 40} When asked why he and Debra got rid of the Magnum, Perez claimed they did so because "it was * * * too much of a gun for" Debra. Perez claimed they had bought the gun so Debra would have "some protection at home" while Perez was on the road. (Actually, Perez had left his truck-driving job in December 2002, whereas Debra did not buy the gun until two months later.)

{¶ 41} Perez then changed his story, saying that he had loaned the gun to someone and had then gotten rid of it because he feared the borrower might have used it in a crime. He identified the borrower as John McGhee and stated, "I believe it was used in a robbery that * * * went bad at the Do Drop."

{¶ 42} Asked why he thought so, Perez alleged that McGhee had said he was going to "hit [him] a lick" – slang for committing a robbery, as Perez explained. Perez also said that McGhee had brought the gun back too fast, and so Perez had thought that something "went bad." Perez claimed that McGhee had

previously "tried to get [him] to do some robberies with him" and that McGhee "told [Perez] he does bars," a statement that made Perez suspect him because bars were "being hit a lot." Perez continued to implicate McGhee during the detectives' questioning.

{¶ 43} When the detectives asked Perez to give an alibi for the Do Drop Inn robbery, Perez said, "I drive semis for a living" and he "believe[d]" he was on the road that night. But he later retracted this claim, admitting that he had not driven semis since December 2002 and was not working at the time of the Do Drop Inn robbery.

{¶ 44} After further questioning, Perez admitted his guilt as to the Do Drop Inn robbery and murder. However, he repeatedly denied that he had intended to kill Johnson. Perez gave the following account of the murder:

{¶ 45} "Approached the building from the side. * * * [W]alked in the door, told everybody don't move, everybody get down on the floor. He [Johnson] said I ain't gotta do a goddamn thing you say, nigger, something to that effect. Told him don't move, don't look. He looked and moved and ran his mouth. It cost him his life. Happened that quick."

{¶ 46} After shooting Johnson, Perez was "pissed off" at him for being a "dumb ass." He walked up to Johnson and asked him, "[W]here you hit?" Johnson said, "Oh, you hit me good."

{¶ 47} Perez also confessed that he had committed the Beverage Oasis robbery and had shot at Conley. Perez repeatedly denied knowing Howard and adamantly refused to identify his accomplice.

{¶ 48} After his confession, Perez made two telephone calls on the detective bureau's phone. Both calls were recorded. The first was to Debra. Perez informed Debra, "I told 'em everything," but added, "I didn't give 'em nothing" with regard to his "buddy" whose name had come up "a lot." He

instructed Debra to "call Cecil and tell him * * * to get * * * gone. Somebody said his name. * * * They said Cecil Howard * * *. They gonna be at him."

{¶ 49} During this conversation, Perez acknowledged that Debra had purchased the guns at his behest and said, "Why should you suffer for s* * * I did, * * * or anybody else? * * * Like they said, there's a family out there that wants to know why that guy was killed * * *." Perez also said, "[I]t's a big weight for real to be lifted off a [person] * * *. I mean I've been thinking about this * * *."

{¶ 50} After calling Debra, Perez called Howard. He told Howard that he had confessed to robbery and murder and that the police had him "dead to right[s]." Perez warned Howard that "John" had implicated Howard, but he assured Howard, "I told 'em I don't know you."

{¶ 51} Sherry Alspaugh, the mother of Perez's daughter, Lindee, visited Perez in jail. On one occasion, Perez told her: "The man would just not shut up * * * so I shot him." Perez also wrote Alspaugh a letter from jail on August 23, 2004. In that letter, he wrote: "About killing that guy. I felt very bad for that * * *."

### E. Other Bar Robberies

{¶ 52} Perez also confessed to a series of armed robberies of Springfield bars between May 29, 2002, and September 11, 2002. He robbed the Nite Owl Tavern on May 29, 2002, the 19th Hole on June 7, Sugarbaker's on June 19, the Lantern Bar on September 2, and the Nite Owl again on September 11. No one was killed during any of these robberies.

### F. Indictment, Trial, and Sentence

{¶ 53} On December 1, 2003, the grand jury returned a 20-count indictment against Perez. Count One charged Perez with the aggravated murder of Ronald Johnson during an aggravated robbery, R.C. 2903.01(B). Count One carried two death specifications: murder during an aggravated robbery, R.C. 2929.04(A)(7), and course of conduct, R.C. 2929.04(A)(5). The indictment also

included counts charging Perez with the attempted murder of Clifford Conley and with aggravated robberies at the Do Drop Inn, the Beverage Oasis, the Nite Owl, the Lantern Bar, Sugarbaker's, and the 19th Hole, among other crimes. However, Counts Two through 20 were eventually severed to be tried without a jury.

{¶ 54} Perez was convicted of the aggravated murder of Johnson and of both specifications. After a penalty hearing, the jury recommended a death sentence. The trial court sentenced Perez to death. He appeals his convictions and death sentence.

## II. Fifth Amendment Issues

{¶ 55} In his fourth proposition of law, Perez contends that the admission of his statements in the tape-recorded conversation with Debra violated his right against self-incrimination under the Fifth Amendment to the United States Constitution. He claims that Debra was conducting "the functional equivalent of an interrogation" and that someone should have given him *Miranda* warnings before he spoke with Debra. See *Miranda v. Arizona* (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694. He also claims that his statements to Debra were coerced, because during his interrogation by police, the detectives told him that they would arrest Debra.

### *A*. Miranda *Claim*

{¶ 56} Perez's *Miranda* claim lacks merit. Debra was not a police officer. Although she was cooperating with the police, Perez did not know that. At most, then, she could be categorized as an undercover agent of the police. But "[c]onversations between suspects and undercover agents do not implicate the concerns underlying *Miranda*." *Illinois v. Perkins* (1990), 496 U.S. 292, 296, 110 S.Ct. 2394, 110 L.Ed.2d 243.

{¶ 57} As *Perkins* explained, *Miranda* was concerned with the inherently compelling pressures produced by custodial interrogation in a police-dominated atmosphere. *Perkins*, 496 U.S. at 296, 110 S.Ct. 2394, 110 L.Ed.2d 243. Those

particular pressures do not exist when the suspect is conversing with an undercover agent: "Questioning by captors, who appear to control the suspect's fate, may create mutually reinforcing pressures that the Court has assumed will weaken the suspect's will, but where a suspect does not know that he is conversing with a government agent, those pressures do not exist. * * * When the suspect has no reason to think that the listeners have official power over him, it should not be assumed that his words are motivated by the reaction he expects from his listeners."  Id. at 297.

{¶ 58} Debra was not Perez's captor.  She neither controlled nor appeared to control Perez's fate.  She had no official power over him; more important, Perez had no reason to suppose that she had any such power.  Thus, the coercive pressures with which *Miranda* is concerned were wholly absent.

{¶ 59} Perez attempts to distinguish *Perkins* because Debra's "statements were specifically designed to elicit incriminating responses from him, making her conversations with him the functional equivalent of an interrogation." Not only does this argument fail to distinguish *Perkins*, it altogether misses the point of that case, which did not turn on the presence or absence of "interrogation" by the undercover agent.

{¶ 60} Perez also tries to distinguish *Perkins* on the ground that Debra's questioning "was engineered in such a way that it created a coercive environment."  But as *Perkins* makes clear, *Miranda* is concerned with only one specific type of coercive environment: that created by custodial interrogation in a police-dominated atmosphere.  Other kinds of allegedly coercive environments may raise questions as to whether a given confession was voluntary, but they do not require *Miranda* warnings.

{¶ 61} Thus, Perez's efforts to distinguish *Perkins* fail.  We reject Perez's *Miranda* claim as inconsistent with *Perkins*.

*B. Involuntary-Confession Claim*

**{¶ 62}** In her conversations with Perez on October 24, 2003, and November 12, 2003, Debra told him that she was worried because detectives were asking about her gun transactions and the Do Drop Inn robbery. She said she was afraid of going to jail, as she had never been in trouble before. She worried about losing custody of Perez's daughter. She repeatedly told Perez that her "nerves [were] shot," and she "cr[ied] all the time." She said that if she had to go to jail, she would probably kill herself.

**{¶ 63}** After the November 12 visit from Debra, Perez asked to speak with detectives and was brought to police headquarters that afternoon. The detectives gave him *Miranda* warnings and asked what he wanted to speak with them about. Perez explained that Debra had told him "that detectives had been coming to [their] house questioning her about * * * a firearm that may have been used in a case that's ongoing." Perez stated that he was "concerned," that Debra had done nothing, and that he was "trying to figure out what's going on."

**{¶ 64}** During the discussion, detectives repeatedly told Perez that Debra was liable to indictment because she had bought the murder weapon and had gotten rid of it after the murder. Perez claims that these statements constituted coercion that rendered his later confession involuntary.

**{¶ 65}** For instance, Detective Hicks said that he knew Debra "got rid of the gun, * * * which automatically brings her into it." "[W]e got a young lady that purchased a gun that was used in a homicide that she properly [sic] sold two days after the homicide." Hicks said, "If we didn't have nothing, we wouldn't be going to your wife with the information we had * * *, information to the Grand Jury to get her indicted." He said that Debra could be indicted "[b]ecause she bought the gun. When she sold it up (Inaudible) we know she know [sic] what it was used for or she wouldn't have gotten rid of it." Perez protested that he had told Debra to get rid of the gun. Hicks replied, "But that don't prove she didn't know what the gun was used for."

{¶ 66} Hicks returned to the subject of Debra's possible prosecution: "It's sad that a woman may have to go to jail that may have had a very little part to play in this." When Perez asked, "[W]hat's she gonna go to jail for?" Hicks replied, "Well, let's see, complicity to the homicide, tampering with evidence."

{¶ 67} Perez asked, "What keeps her from going to jail?" Hicks replied that he intended to present the evidence against Debra to the grand jury, "as long as [the police] think she got a part to play in it * * *. But you the only one knows (Inaudible)."

{¶ 68} Sergeant Ronald Flores said: "Now, there's a way to clean this up a little bit. Let us know how it actually happened. * * * Your wife, she's brought into this. She is part of this case. Is there a way to help her? There's possible ways, but we've got to know her involvement. Right now I would have to tell the Grand Jury that she's involved in this, completely, 110 percent. * * * There's only one way * * * for me to be convinced different. And that's for you to tell me what her involvement is. We know you're involved in this. * * * And you're the one * * * that can clear us up."

{¶ 69} Later, Flores said: "I think * * * the one thing you probably have respect for is your wife. And I don't know what happened to make you [kill Johnson] * * *, but this is your opportunity to tell us."

{¶ 70} Flores asked Perez what the most important thing in his life was. Perez replied that it was his wife, daughter, and son. Flores replied, "That's the most important thing. Now, time to step up and do the right thing." Shortly after this last exchange, Perez began to confess to the murder.

{¶ 71} Voluntariness of a confession is determined based on the totality of the circumstances. *State v. Edwards* (1976), 49 Ohio St.2d 31, 3 O.O.3d 18, 358 N.E.2d 1051, paragraph two of the syllabus. However, the use of an inherently coercive tactic by police is a prerequisite to a finding of involuntariness. *Colorado v. Connelly* (1986), 479 U.S. 157, 167, 107 S.Ct. 515, 93 L.Ed.2d 473.

Hence, we need not assess the totality of the circumstances unless we first find that the detectives used a coercive tactic. *State v. Treesh* (2001), 90 Ohio St.3d 460, 472, 739 N.E.2d 749. In this case, Perez claims that the detectives used a coercive tactic when they expressed their intention to seek Debra's prosecution unless Perez gave them information about his crimes.

{¶ 72} "[T]hreats to arrest members of a suspect's family may cause a confession to be involuntary." *United States v. Finch* (C.A.6, 1993), 998 F.2d 349, 356. The issue "turns on * * * whether the threat could have been lawfully executed." *United States v. Johnson* (C.A.6, 2003), 351 F.3d 254, 263. If the police had probable cause to arrest the person in question, a threat to do so is not coercive and thus does not render a confession involuntary. Id.

{¶ 73} "Probable cause exists if the facts and circumstances known to the officer warrant a prudent man in believing that the offense has been committed." *Henry v. United States* (1959), 361 U.S. 98, 102, 80 S.Ct. 168, 4 L.Ed.2d 134. "Probable cause does not require the same type of specific evidence of each element of the offense as would be needed to support a conviction." *Adams v. Williams* (1972), 407 U.S. 143, 149, 92 S.Ct. 1921, 32 L.Ed.2d 612. Rather, probable cause is a "practical, nontechnical conception," *Brinegar v. United States* (1949), 338 U.S. 160, 176, 69 S.Ct. 1302, 93 L.Ed. 1879, that "turn[s] on the assessment of probabilities in particular factual contexts." *Illinois v. Gates* (1983), 462 U.S. 213, 232, 103 S.Ct. 2317, 76 L.Ed.2d 527.

{¶ 74} The record indicates that the detectives had probable cause to arrest Debra for obstructing justice with regard to Johnson's murder. They knew that Debra knew about the murder after it happened, because Robby Smith, Debra's teenage son, had told them about Perez's remark to Debra that he had "made the front page." Robby had also told them that Perez had used a chrome .357 handgun and directed them to the flea market where it had been traded. After

visiting the flea market and tracing the .357, they knew that Debra had traded it for two other guns only two days after the murder.

**{¶ 75}** They also had probable cause to arrest her for complicity in the Do Drop Inn robbery. They had visited the pawnshop where Debra had bought the .357, and they knew from the firearm-transaction record that Debra had bought it. While there is no direct evidence that she knew he was going to commit robbery with it, the officers knew from talking to Debra that she had treated Perez's wound from the Beverage Oasis shootout. They also knew from Robby that Perez was willing to talk to Debra about his crimes, at least after the fact. Hence, they could infer that Debra knew that Perez had been committing robberies when she procured the .357 for him.

**{¶ 76}** Because the officers could have lawfully arrested Debra, threatening to do so was not a coercive tactic. *Johnson*, 351 F.3d at 263. Thus, Perez's fourth proposition of law is overruled.

### III. Sufficiency of Evidence of Course-of-Conduct Specification

**{¶ 77}** In Parts C and E of his first proposition of law, Perez contends that the state did not introduce sufficient evidence to prove the existence of the course-of-conduct aggravating circumstance. He claims that the murder of Johnson during the Do Drop Inn robbery and the attempt to kill Clifford Conley during the Beverage Oasis robbery do not constitute a "course of conduct" within the meaning of R.C. 2929.04(A)(5), as interpreted in *State v. Sapp*, 105 Ohio St.3d 104, 2004-Ohio-7008, 822 N.E.2d 1239.

**{¶ 78}** In *Sapp*, we held: "The statutory phrase 'course of conduct' found in R.C. 2929.04(A)(5) requires that the state establish some factual link between the aggravated murder with which the defendant is charged and the other murders or attempted murders that are alleged to make up the course of conduct. In order to find that two offenses constitute a single course of conduct under R.C. 2929.04(A)(5), the trier of fact 'must * * * discern some connection, common

scheme, or some pattern or psychological thread that ties [the offenses] together.' " *Sapp*, 105 Ohio St.3d 104, 2004-Ohio-7008, 822 N.E.2d 1239, syllabus, quoting *State v. Cummings* (1992), 332 N.C. 487, 510, 422 S.E.2d 692. We further held that the required factual link may consist of "a similar pattern of secondary crimes * * * involving each victim." *Sapp*, ¶ 52.

{¶ 79} As Perez concedes, the murder of Johnson and the attempted murder of Conley were both committed during aggravated robberies, and both were committed with firearms. However, Perez argues, the two crimes were in other respects so dissimilar that they cannot be considered part of the same course of conduct under *Sapp*. He notes that the crimes took place eight months apart at different locations and that the victims were unrelated. He contrasts the shootout at the Beverage Oasis, where Conley fired first, with the Do Drop Inn murder, where Perez fired the only shot.

{¶ 80} However, *Sapp* illustrates that offenses can have significant differences in "factual circumstances and modi operandi," 105 Ohio St.3d 104, 2004-Ohio-7008, 822 N.E.2d 1239, ¶ 58, and yet constitute a single course of conduct. In *Sapp*, the state alleged that three murders and one attempted murder constituted a course of conduct. Two of the victims were children; two were adults. Two of the crimes involved accomplices; two did not. Three were committed outdoors, one indoors. The defendant used different weapons and different methods of killing the victims and hiding their bodies. Id. at ¶ 58. Despite these dissimilarities, we held in *Sapp* that the aggravated murders were part of a single course of conduct sufficient to support the defendant's conviction under R.C. 2929.04(A)(5). See generally id. at ¶ 58-61.

{¶ 81} Moreover, the eight-month separation between the attempted murder of Conley and the murder of Johnson is not dispositive. *Sapp* establishes that "murders taking place at different times 'may satisfy the R.C. 2929.04(A)(5) specification so long as the offender's actions were part of a continuing course of

criminal conduct.' * * * Thus, the length of time between offenses does not necessarily determine whether the offenses form a course of conduct." *Sapp*, 105 Ohio St.3d 104, 2004-Ohio-7008, 822 N.E.2d 1239, ¶ 55, quoting *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶ 71.

**{¶ 82}** Thus, in *Sapp*, we held that murders committed over a year apart were part of the same course of conduct, based on common motives and similarity in the modi operandi of the crimes. 105 Ohio St.3d 104, 2004-Ohio-7008, 822 N.E.2d 1239, ¶ 59-60. See also *State v. Cummings*, 332 N.C. at 510-511, 422 S.E.2d 692 (two murders 26 months apart constituted a course of conduct); *Corwin v. State* (Tex.Crim.App.1993), 870 S.W.2d 23, 27-28 (three similar murders and two attempted murders over 13 years constituted course of conduct).

**{¶ 83}** In this case, the murder and the attempted murder took place in the city of Springfield during aggravated robberies with similar modi operandi. The Do Drop Inn and the Beverage Oasis were similar businesses, in that both specialized in the sale of alcoholic beverages at retail.[1] Both robberies were committed late at night. (The Do Drop Inn was invaded between 11:30 and midnight, and the Beverage Oasis, just before its 11:00 p.m. closing time.) In both cases, Perez fired at an uncooperative victim. Cf. *Sapp*, 105 Ohio St.3d 104, 2004-Ohio-7008, 822 N.E.2d 1239, ¶ 60 (finding evidence of common motive where the murderer perceived each victim as having provoked him, albeit in different ways). Both robberies were committed by two armed, masked perpetrators.

**{¶ 84}** The evidence thus establishes the presence of "a similar pattern of secondary crimes * * * involving each victim." *Sapp*, 105 Ohio St.3d 104, 2004-

---

1. Perez argues that the two were "different types of businesses" because the Beverage Oasis was a drive-through store instead of a bar. We think otherwise. The Beverage Oasis name, along with its numerous signs advertising beer, wine, and Zima (thoroughly documented by crime-scene photographs in the record), shows that it was engaged in the business of selling liquor.

Ohio-7008, 822 N.E.2d 1239, ¶ 52. Hence, there is a factual link between the aggravated murder of Johnson and the attempted aggravated murder of Conley sufficient to establish that both crimes are part of the same course of conduct for purposes of R.C. 2929.04(A)(5). [2]

### IV. Evidence of Uncharged Bar Robberies

{¶ 85} In part B of his first proposition of law, and in his second proposition of law, Perez claims that the state violated Evid.R. 404(B) by introducing evidence of five uncharged bar robberies in which no victim was killed. This rule allows the admission of "[e]vidence of other crimes * * * for * * * purposes, such as proof of motive, opportunity, intent, * * * plan, * * * identity or absence of mistake or accident."

{¶ 86} Evidence of the following robberies was introduced:

{¶ 87} **May 29, 2002:** At 2:00 a.m., two masked men with guns entered the back door of the Nite Owl Tavern. One of them grabbed barmaid Rhonda Boyd by the hair and ordered her to remove all the money from the till and place it in bags. After Boyd complied, the gunman made her lie down on the floor. The robbers got away with between $400 and $600.

{¶ 88} **June 7, 2002:** At approximately 12:45 a.m., a man entered the 19th Hole wearing black clothing and a ski mask and carrying a pump shotgun. The owner, an employee, and two customers were in the bar. Raising the gun, the robber warned: "This is no joke." He told the owner to "get the money" and ordered the others to lie on the floor. The owner emptied the cash register into a bag, which he gave to the robber.

---

2. At trial, the state argued that the murder of Johnson and the attempted murder of Conley are also linked as part of Perez's broader pattern of committing robberies, including the nonfatal robberies. However, the state has abandoned that theory in this appeal. As the state's brief points out, the trial court excluded that theory from the case by refusing the prosecution's request to instruct the jury on it. We need not, therefore, determine whether such a link could be relevant to the existence of a course of conduct under R.C. 2929.04(A)(5).

**{¶ 89} June 19, 2002:** At 12:45 a.m., two masked men with guns walked into Sugarbaker's. Donald Mercer, the owner, and Ricky Bruce, a friend of Mercer, were at a table. The gunmen ordered them to lie on the floor and produce their wallets. One robber emptied the register. The other went to collect Mercer's and Bruce's wallets. The robber placed the muzzle of his shotgun up against Bruce's neck and commanded him to hurry. The robbers then left.

**{¶ 90} Labor Day, September 2, 2002:** At 11:05 p.m., a man wearing a mask and dark clothing entered the Lantern Bar through the back door. He pointed a handgun at bartender Monty Demmy and ordered him to get money from the cash register. He asked Demmy, "Is this all you got?" Demmy replied that business was slow due to the holiday.

**{¶ 91}** The robber forced Demmy to open the safe, but it was empty. The robber went back to the bar, ordered the customers to place their hands on the counter, and then robbed them. When owner Rosemary Demmy pushed a "panic button," the robber fled.

**{¶ 92} September 11, 2002:** While walking to the Nite Owl Tavern, Gina Smith noticed a red Camaro with black T-tops parked on the street. (Perez owned such a car.) She saw someone inside the car donning black gloves. Between approximately 1:30 and 2:00 a.m., a masked man with a handgun came in through the back door of the Nite Owl. He told everyone in the place to "get down" on the floor and ordered the barmaid to give him all the money from the register. According to Smith, the gunman appeared to be the same person she had seen in the Camaro. He got away with between $300 and $400.

**{¶ 93}** Just before the state began its presentation of evidence on these robberies, the trial court instructed the jury that the evidence was being "received only for a limited purpose" and could be considered "only for the purpose of deciding whether it proves the Defendant's plan to commit the offenses charged at this trial." The jury was told: "You may not use these uncharged acts for any

other purpose." The court specifically instructed the jury: "[Y]ou may not consider it to prove the character of the Defendant in order to show that he acted in conformity with that character." Finally, the court instructed that Perez "is on trial only for the offense of aggravated murder in this case and may not be held responsible in this case [for] any other acts." During the guilt-phase jury charge, the trial court repeated these instruction, adding that the jury could consider the other-acts evidence to prove "motive, intent, purpose or plan to commit the offense charged."

{¶ 94} In his second proposition of law, Perez contends that evidence of the nonfatal robberies was improperly admitted.

{¶ 95} The state argues that the nonfatal robberies were relevant to show that Perez intended to kill Johnson, thus refuting Perez's claim that he did not intend to kill Johnson. According to the state, the nonfatal robberies show that when Perez committed robberies, he was in control of himself and did not harm compliant victims. The only two robberies in the series during which Perez fired his weapon were the Beverage Oasis and Do Drop Inn robberies, and those are also the only two during which Perez faced a victim's noncompliance.

{¶ 96} The admission of other-acts evidence under Evid.R.404(B) "lies within the broad discretion of the trial court, and a reviewing court should not disturb evidentiary decisions in the absence of an abuse of discretion that has created material prejudice." *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565, ¶ 66.

{¶ 97} The argument that the nonfatal bar robberies are relevant to motive and intent is a reasonable one. The trial court's decision to admit them for those purposes was not "unreasonable, arbitrary, or unconscionable." *State v. Adams* (1980), 62 Ohio St.2d 151, 157, 16 O.O.3d 169, 404 N.E.2d 144. Admitting the evidence was therefore not an abuse of discretion.

{¶ 98} Perez further contends that the nonfatal robberies do not establish his identity as Johnson's killer, because they do not show a unique "behavioral fingerprint" that could be used to identify him. But Perez's argument that the nonfatal robberies could not be considered to show identity is misdirected, because the jury was never instructed that it could consider those robberies for that purpose.

{¶ 99} Just before the state began its presentation of evidence on the nonfatal robberies, the trial court instructed the jury: "You are about to hear some evidence from a series of witnesses about the crimes or acts other than the evidence [sic] for which the Defendant is charged in this trial. That evidence is being received only for a limited purpose. It was not – it will not be received and you may not consider it to prove the character of the Defendant in order to show that he acted in conformity with that character.

{¶ 100} "If you find that the evidence of other crimes or acts is true and that the Defendant committed them, then you may consider that evidence only for the purpose of deciding whether it proves the Defendant's plan to commit the offenses charged in this trial. You may not use these uncharged acts for any other purpose.

{¶ 101} "Your responsibility is to decide whether the Prosecution proves beyond a reasonable doubt only the acts charged in this case. The Defendant is on trial only for the offense of aggravated murder in this case and may not be held responsible in this case from [sic] any other acts."

{¶ 102} The trial court essentially repeated this instruction during the guilt-phase jury charge, except for stating that the jury could consider the other-acts evidence to prove "motive, intent, purpose or plan to commit the offense charged."

{¶ 103} It is true that the trial court, in ruling on a defense motion *outside* the presence of the jury, indicated that the robberies shared a common modus

operandi and could be introduced, among other purposes, to show the perpetrator's identity. But no such theory of relevance was ever presented to the jury. To the contrary, the jury was instructed not to use the nonfatal robberies "for any other purpose" than to show motive, intent, purpose, or plan. The jury is presumed to follow the trial court's instructions. *State v. Loza* (1994), 71 Ohio St.3d 61, 75, 641 N.E.2d 1082. We overrule Perez's second proposition of law.

{¶ 104} In part B of his first proposition of law, Perez contends that the nonfatal bar robberies are not relevant to the existence of the course-of-conduct specification. R.C. 2929.04(A) provides: "Imposition of the death penalty for *aggravated murder* is precluded unless one or more of the following is specified in the indictment * * * and proved beyond a reasonable doubt: * *  (5) * * * the offense at bar [i.e., the charged aggravated murder] was part of a course of conduct involving the *purposeful killing of or attempt to kill* two or more persons by the offender." (Emphasis added.)

{¶ 105} Thus, the "course of conduct" to be proven by the state consists of "the offense at bar" – i.e., the aggravated murder to which the specification attaches – plus one or more other "purposeful killing[s] * * * or attempt[s] to kill." Therefore, Perez argues, robberies in which no purposeful killing or attempted killing took place are not part of a "course of conduct" for purposes of R.C. 2929.04(A)(5).

{¶ 106} However, as the state points out, the trial court specifically refused to instruct that the nonfatal robberies were relevant to prove the course-of-conduct specification. Indeed, the trial court instructed the jury not to use the nonfatal robberies "for any other purpose" than to show motive, intent, purpose, or plan. Because the trial court did not instruct the jury to consider the nonfatal robberies as course-of-conduct evidence, Perez's argument that the jury could consider them for that purpose is again misdirected. We therefore reject Part B of Perez's first proposition of law.

## V. Admission of Spousal Communications

{¶ 107}  In his third proposition of law, Perez contends that the admission at trial of his taped conversations with his wife, Debra Perez, was improper.  He contends both that it violated the marital-communications privilege embodied in R.C. 2945.42 and that it denied him due process.

{¶ 108}  After police investigators learned from Robby Smith that Perez had committed the Do Drop Inn murder, they spoke with Perez's wife, Debra.  They then went to the Caesar's Creek flea market and traced the .357 Magnum used in the murder.  They also went to the pawnshop where Debra had bought it and obtained the transaction record.  After that, the detectives told Debra what they had and asked her to visit Perez in jail and "do some taped conversations."  Debra agreed to allow her conversations with Perez to be recorded.  The police recorded jailhouse conversations between Perez and Debra on October 24 and November 12, 2003.

{¶ 109}  Before trial, Perez filed a motion to suppress the October 24 and November 12 conversations.  After a hearing, the trial court denied the motion, stating: "[W]here the testimony of Mrs. Perez is not needed to authenticate the tapes, neither the concept of privilege nor competency apply, because the issue is not the admissibility of the testimony of Mrs. Perez regarding the statements made by the defendant to her, but of the audio tape recording of that conversation."

### A. Applicability of the Statutory Privilege

{¶ 110}  R.C. 2945.42 provides: "Husband or wife shall not testify concerning a communication made by one to the other, or act done by either in the presence of the other, during coverture, unless the communication was made or

act done in the known presence or hearing of a third person competent to be a witness * * *." [3]

{¶ 111}  When Debra testified at trial, the prosecution did not ask her to repeat any statement by Perez (except one made in the presence of Robby Smith). The prosecutor disclaimed any intention to question her about the October 24 and November 11 conversations, precisely "because * * * the statute says that she can't testify as to these communications." Thus, Perez's jailhouse conversations with Debra were introduced only through the tape recordings.  That circumstance requires us to answer the following question: Does R.C. 2945.42 bar only a spouse's *testimony* concerning marital communications, or does it also bar the introduction of *tape recordings* of such communications, even where the spouse does not testify?

{¶ 112}  The R.C. 2945.42 privilege belongs to the nontestifying spouse. *State v. Savage* (1987), 30 Ohio St.3d 1, 2, 30 OBR 11, 506 N.E.2d 196.  Thus, "[s]pousal privilege cannot be waived unilaterally and allows a defendant to prevent his or her spouse from testifying [as to a privileged communication] unless one of the statute's exceptions applies."  *State v. Brown*, 115 Ohio St.3d 55, 2007-Ohio-4837, 873 N.E.2d 858, ¶ 55, fn. 3.  Perez contends that admitting the taped conversations was the "equivalent" of allowing Debra to testify to the content of the conversations and was thus equally impermissible under R.C. 2945.42.

{¶ 113}  But R.C. 2945.42 specifies that a "[h]usband or wife shall not *testify* concerning a communication made by one to the other * * *." (Emphasis added.)  Thus, on its face, the statute does no more than preclude a spouse from *testifying* to the other spouse's statements.  The state, focusing on the actual

---

3. For some reason, Perez cites R.C. 2317.02(D) instead of R.C. 2945.42, which specifically applies to criminal prosecutions.

language of R.C. 2945.42, contends that the admission of Perez's tape-recorded statements to Debra did not violate the statute.

{¶ 114} In *People v. Fisher* (1993), 442 Mich. 560, 503 N.W.2d 50, the court construed Michigan's privilege statute, which provided that one spouse could not, without the other's consent, " 'be *examined* as to any communication made by one to the other during the marriage.' " (Emphasis added.) Id. at 568, quoting Michigan Codified Laws 600.2162. The court concluded that the statute did not apply:

{¶ 115} "The statute provides that neither spouse may 'be examined' with respect to any communication made by one to the other during the marriage. This phrase, 'be examined,' connotes a narrow testimonial privilege only – a spouse's privilege against being questioned as a sworn witness about the described communications. In other words, the spouse must testify for the privilege to apply. The introduction of the marital communication through other means is not precluded." Id. at 575, 503 N.W.2d 50. Accord *Shults v. State* (1980), 96 Nev. 742, 746-747, 616 P.2d 388 (because appellant's wife was not a witness at trial, she was not "examined" within contemplation of marital-communications-privilege statute).

{¶ 116} *Fisher* noted that "[t]he undisputed modern trend is toward a restrictive, rather than expansive, interpretation of the privilege." *Fisher* at 573-574, 503 N.W.2d 50. The court explained that privileges should be narrowly construed, as they conflict with the court's truth-finding function. Id. at 574-575.

{¶ 117} Similarly, in *State v. Clark*, 1997 ND 199, 570 N.W.2d 195, a state rule of evidence provided: "An accused in a criminal proceeding has a privilege to prevent *his spouse* from *testifying* as to any confidential communication between the accused and the spouse." (Emphasis added.) N.D.Evid.R. 504(b). The court held that the rule "specifically allows only the exclusion of testimony by an accused's spouse" and "does not give an accused the

privilege to exclude the testimony of other witnesses about a confidential communication between the accused and his spouse." *Clark* at ¶ 21. Accord *Kidd v. State* (1997), 330 Ark. 479, 487, 955 S.W.2d 505 (same result applying identically worded rule of evidence). See also *State v. Schifsky* (1955), 243 Minn. 533, 539-540, 69 N.W.2d 89 (marital-communications-privilege statute related only to testimony by spouse as a witness).

{¶ 118} Other courts have found it inconsistent with the marital-communications privilege to permit marital communications to come into evidence through a third party who obtained them from, or with the help of, the recipient spouse. See *United States v. Neal* (D.Colo.1982), 532 F.Supp. 942, 949; *People v. Gardner* (1982), 105 Ill.App.3d 103, 115-116, 60 Ill.Dec. 951, 433 N.E.2d 1318; *Bayse v. State* (Miss.1982), 420 So.2d 1050, 1053-1054. "Just as that spouse would not be permitted, against the will of the communicating spouse, to betray the confidence by testifying in court to the message, so he or she may not effectively destroy the privilege by out-of-court betrayal." 1 McCormick on Evidence (6th Ed.2006) 377, Section 82.

{¶ 119} Applying this principle, some courts have held that marital confidences surreptitiously recorded by, or with the help of, the recipient-spouse should be excluded. See *Hicks v. Hicks* (1967), 271 N.C. 204, 206-207, 155 S.E.2d 799; *People v. Dubanowski* (1979), 75 Ill.App.3d 809, 812, , 31 Ill.Dec. 403, 394 N.E.2d 605.

{¶ 120} We agree with the Michigan Supreme Court's analysis in *Fisher*. "In construing a statute, we may not add or delete words." *State v. Hughes* (1999), 86 Ohio St.3d 424, 427, 715 N.E.2d 540. R.C. 2945.42 states that a "[h]usband or wife shall not testify concerning a communication made by one to the other * * *." Like the phrase "be examined" in Michigan's statute, the word "testify" in R.C. 2945.42 clearly precludes the spouse's testimony. Just as

clearly, it does not preclude "introduction of the marital communication through other means." *Fisher*, 442 Mich. at 575, 503 N.W.2d 50.

{¶ 121} Our holding also accords with the fundamental principle of construing privileges narrowly. Privileges are to be construed narrowly because they impede the search for truth and contravene the principle that the public has a right to everyone's evidence. See, e.g., *Trammel v. United States* (1980), 445 U.S. 40, 50, 100 S.Ct. 906, 63 L.Ed.2d 186; *Pierce Cty., Washington v. Guillen* (2003), 537 U.S. 129, 144-145, 123 S.Ct. 720, 154 L.Ed.2d 610; *Ariz. Indep. Redistricting Comm. v. Fields* (Ct.App.2003), 206 Ariz. 130, 75 P.3d 1088, ¶ 14; *Shanabarger v. State* (Ind.App.2003), 798 N.E.2d 210, 215; *Mullins v. Commonwealth* (Ky.1997), 956 S.W.2d 210, 212; *Ballensky v. Flattum-Riemers*, 2006 N.D. 127, 716 N.W.2d 110, ¶ 26; *Guillen v. Pierce Cty.* (2001), 144 Wash.2d 696, 716, 31 P.3d 628, fn. 1, reversed on other grounds, *Pierce Cty., Washington v. Guillen*, 537 U.S. 129, 123 S.Ct. 720, 154 L.Ed.2d 610.

{¶ 122} Because the jailhouse conversations were not introduced by way of Debra's testimony, we hold that their admission did not violate R.C. 2945.42.

*B. Due Process Claim*

{¶ 123} Perez also argues that admitting the taped conversations denied him due process of law because it gave the prosecution "an unfair advantage." He makes no effort to explain *how* admitting the conversations rendered his trial unfair. Moreover, the marital-communications privilege does not derive from the United States Constitution. See *United States v. Doe* (C.A.1, 1973), 478 F.2d 194, 195; *Port v. Heard* (C.A.5, 1985), 764 F.2d 423, 430; *Byrd v. Armontrout* (C.A.8, 1989), 880 F.2d 1, 9-10; *United States v. Lefkowitz* (C.A.9, 1980), 618 F.2d 1313, 1319; *Rankin v. Roberts* (D.Kan.1992), 788 F.Supp. 521, 523, affirmed (C.A.10, 1993), 9 F.3d 117. We therefore reject Perez's due process claim and overrule his third proposition of law.

## VI. Confrontation Issue

**{¶ 124}** In his fifth proposition of law, Perez contends that the trial court deprived him of his constitutional right to confront Debra pursuant to the Sixth Amendment to the United States Constitution.

**{¶ 125}** The taped conversations between Perez and Debra were played during the testimony of Detective DeWine. Debra testified after DeWine, but the tapes were not played during her testimony. The defense objected to this procedure, arguing that the hearsay rule required that Debra herself be on the witness stand when the tapes were played. The trial court overruled this objection.

**{¶ 126}** Perez now contends that by letting the tapes be played during DeWine's testimony and not requiring that they be played during Debra's testimony, the trial court somehow deprived him of the right to cross-examine Debra with respect to statements made by her during the taped conversations.

**{¶ 127}** Perez's confrontation claim lacks merit. "[W]hen the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements. * * * The Clause does not bar admission of a statement so long as the declarant is present at trial to defend or explain it." *Crawford v. Washington* (2004), 541 U.S. 36, 59, 124 S.Ct. 1354, 158 L.Ed.2d 177, fn. 9, citing *California v. Green* (1970), 399 U.S. 149, 162, 90 S.Ct. 1930, 26 L.Ed.2d 489. See also *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 110. Perez cites no authority for his contention that the Confrontation Clause requires such a statement to be introduced *during* the testimony of the declarant.

**{¶ 128}** Moreover, nothing would have prevented Perez from cross-examining Debra about her statements on the tapes had he chosen to do so. Under Evid.R. 611(B), cross-examination is not limited to the scope of direct examination, but may cover "all relevant matters." Thus, Perez could have asked Debra about the taped conversations on cross-examination, notwithstanding that

they were not introduced during her direct examination.  Perez's fifth proposition of law is overruled.

## VII. Instructions

{¶ 129}  In his eighth proposition of law, Perez contends that the trial court made two errors in the guilt-phase instructions.

*A. Accomplice Testimony*

{¶ 130}  First, Perez contends that Debra was an accomplice to his crimes and that therefore, the court should have instructed the jury accordingly. Perez concedes that Debra was not charged with complicity in his crimes, but he argues that there was sufficient evidence to charge her with aiding and abetting Perez, because she obtained and disposed of guns on his behalf and, according to Perez, knew that he was committing robberies.  Therefore, he claims, the trial court should have instructed the jury that her testimony was "subject to grave suspicion" and must "be weighed with great caution," as required by R.C. 2923.03(D).

{¶ 131}  As Perez did not request such an instruction at trial, this issue is waived absent plain error.  *State v. Yarbrough*, 104 Ohio St.3d 1, 2004-Ohio-6087, 817 N.E.2d 845, ¶ 77.  We find no plain error here.  In *State v. Wickline* (1990), 50 Ohio St.3d 114, 552 N.E.2d 913, we construed former R.C. 2923.03(D), which provided: "No person shall be convicted of complicity under this section solely upon the testimony of an accomplice * * * ." 134 Ohio Laws, Part II, 1866, 1961. We determined that "at the very least, an 'accomplice' must be a person indicted for the crime of complicity."  Id. at 118.

{¶ 132}  Although R.C. 2923.03(D) has been amended – it now requires only that the jury be instructed on how to evaluate accomplice testimony – there is no evidence that the General Assembly intended to change the meaning of the term "accomplice."

{¶ 133} In any event, Debra's testimony was not important to the state's case. She identified firearm-transaction records that documented her gun purchases; admitted selling the .357 Magnum after the murder, recounted how she had helped Perez treat his wounded arm in June 2002, acknowledged that she and Perez had owned a red Camaro, and repeated Perez's boast (also testified to by Robby Smith) that he had "made the front page" after Johnson's murder. Her testimony was relevant to corroborate peripheral details of the state's case, but its significance pales in comparison to Perez's tape-recorded jail conversations and his detailed confession of guilt.

{¶ 134} For the foregoing reasons, the trial court did not commit plain error by failing to give an accomplice-testimony instruction.

### B. Other-Acts Instruction

{¶ 135} Perez also contends that the trial court's other-acts instruction was insufficient. We have stated that when other-acts evidence is admitted for a limited purpose, "the jury should be instructed that such evidence must not be considered by them as any proof whatsoever that the accused did any act alleged in the indictment." *State v. Flonnory* (1972), 31 Ohio St.2d 124, 129, 60 O.O.2d 95, 285 N.E.2d 726. The trial court did not give that instruction. But at trial, Perez neither objected to the other-acts instruction given nor requested a *Flonnory* instruction.

{¶ 136} Perez's failure to request an instruction waives this issue for appeal. See *State v. Davis* (1991), 62 Ohio St.3d 326, 339, 581 N.E.2d 1362. Where the defense fails to request a limiting instruction on other-acts evidence, the trial court's failure to give such an instruction is not plain error where "[n]othing suggests that the jury used 'other acts' evidence to convict [the defendant] because she was a bad person." *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565, ¶ 91, citing *State v. Grant* (1993), 67 Ohio St.3d 465, 472, 620 N.E.2d 50.

**{¶ 137}** In this case, the trial judge specifically warned the jury *not* to use the other-acts evidence "to prove [Perez's] character * * * in order to show that he acted in conformity with that character." In fact, the judge told the jury not to use it for any purpose but to determine the existence of "motive, intent, purpose, or plan to commit the offense charged." Thus, no plain error occurred, and Perez's objection is waived. His eighth proposition of law is accordingly overruled.

## VIII. Challenge for Cause

**{¶ 138}** In his seventh proposition of law, Perez contends that the trial court incorrectly overruled his challenge for cause to a prospective juror.

**{¶ 139}** During voir dire, Perez challenged Juror 1830 on the ground that he would automatically vote for a death sentence. A defendant has a constitutional right to exclude for cause any prospective juror who will automatically vote for the death penalty. *Morgan v. Illinois* (1992), 504 U.S. 719, 729, 112 S.Ct. 2222, 119 L.Ed.2d 492.

**{¶ 140}** On a challenge for cause, "[t]he ultimate question is whether the 'juror sw[ore] that he could set aside any opinion he might hold and decide the case on the evidence, and [whether] the juror's protestation of impartiality [should be] believed.' " *White v. Mitchell* (C.A.6, 2005), 431 F.3d 517, 538, quoting *Patton v. Yount* (1984), 467 U.S. 1025, 1036, 104 S.Ct. 2885, 81 L.Ed.2d 847. A trial court's resolution of a challenge for cause will be upheld on appeal unless it is unsupported by substantial testimony, so as to constitute an abuse of discretion. *State v. Tyler* (1990), 50 Ohio St.3d 24, 31, 553 N.E.2d 576.

**{¶ 141}** On voir dire, the prosecutor informed Juror 1830, "[T]he judge is gonna give you the instructions of law as to what factors you're to consider in favor of the death penalty and what factors you are to consider not in favor of the death penalty * * *." The prosecutor asked whether Juror 1830 could set aside his personal opinions: "[W]ill you be able to * * * follow the instructions of law and

weigh the factors that the Judge gives you and follow the instructions on how you're supposed to weigh that." The juror said he could.

**{¶ 142}** The prosecutor then asked: "[I]f the facts and the law justify a recommendation of something other than death, do you believe that you could put your name on a verdict form recommending something other than death?" The juror answered: "Yes, I think I could."

**{¶ 143}** During voir dire, the defense asked Juror 1830 to explain his responses to two questions on the jury questionnaire. Question 64 asked: "Do you agree or disagree with the proposition that if someone purposefully murders someone during the commission of another serious crime, like robbery, that offender should automatically, upon conviction, be sentenced to death[?]" Juror 1830 checked "Disagree." In the space below, asking the juror to "explain why you feel that way," Juror 1830 wrote: "I do not know why I feel that way."

**{¶ 144}** Question 67 dealt with a juror's attitude toward capital punishment in general: "If you are in favor of the death penalty, please explain why." Juror 1830 wrote: "If a person is found guilty of a crime that has the death penalty, They have taken others [sic] life and they should pay with theirs."

**{¶ 145}** When defense counsel asked Juror 1830 to elaborate on Question 67, he replied: "Well, if they're found guilty within a reasonable doubt, you know, there's no doubt about it. * * * That's pretty much how I feel that * * * there's no, I want to say, possibility that anybody else * * * did it." This exchange followed:

**{¶ 146}** "Q. So you're convinced nobody else did it, * * * would that end the inquiry?

**{¶ 147}** "A. *No*, it all depends, like I said, what the Judge –. " (Emphasis added.)

**{¶ 148}** At this point, defense counsel interrupted the juror to ask him about Question 64, where the juror had indicated that the death penalty should *not*

be automatic for a purposeful killing during a felony. The juror said: "Yeah, *they shouldn't automatically* [be sentenced to death]. All depends on circumstances." (Emphasis added.) Defense counsel then asked the juror whether he would "vote for death just because they proved an aggravated murder with an aggravating circumstance." The juror replied: "Well, it all depends on we would deliberate [sic] * * * if it was proven – I don't really know. I've never been in that situation."

{¶ 149} Defense counsel then asked Juror 1830 whether, once convinced of the defendant's guilt, he would want to know anything else before deciding on a penalty. The juror replied: "Well, if it's proven, I mean, beyond a shadow of a doubt that they're guilty and the sentence would be death."

{¶ 150} Almost immediately, however, the juror backtracked. Defense counsel queried:

{¶ 151} "Q. * * * [A]re you telling me that if you're convinced there's no doubt about it, then the appropriate sentence would be death no matter what else that you might hear?

{¶ 152} "A. Oh, no, it wouldn't be appropriate. It all depends on everything else."

{¶ 153} Asked "what else [he] would like to hear" before voting on a sentence, Juror 1830 said: "Well, I guess really it's the circumstances and why * * *.

{¶ 154} "Q. Okay. What if it's been proven * * * that it's a purposeful shooting with a gun during a robbery? * * * Anything else you want to know?

{¶ 155} "A. No."

{¶ 156} Asked whether he would consider the defendant's background, Juror 1830 said: "[S]ometimes it has something to do with it," but he also said: "No. Background of the person should not. * * * If they committed [the crime] you know."

**{¶ 157}** Asked whether remorse would matter, the juror initially said, "No," but then added, "It would matter, but I don't know whether it would change my verdict."

**{¶ 158}** Finally, defense counsel asked: "I think your inclination is * * * once you get to the purposeful killing, that pretty much ends the inquiry for you?" The juror replied, "Yeah."

**{¶ 159}** When the judge asked Juror 1830 whether he could "follow the court's instructions and fairly consider *and weigh* both *the mitigating factors* and the aggravating circumstances in this case," the juror replied, "Yes, I think I can." (Emphasis added.)

**{¶ 160}** The prosecutor and the juror then had the following exchange:

**{¶ 161}** "Q. * * * [I]t all comes back to * * * what we were talking about before, personal opinion versus whether you were able to follow the law.

**{¶ 162}** "A. Right.

**{¶ 163}** "Q. When you were talking to [defense counsel], you were expressing a personal opinion. Is that a fair characterization?

**{¶ 164}** "A. I mean I can follow the instructions, I do have personal opinions about.

**{¶ 165}** "Q. But as you're sitting here today you're telling both sides, when the Court instructs you as to the law in this case *and the factors to consider*, that you can fairly consider *those factors* as the Judge instructs you.

**{¶ 166}** "A. Right." (Emphasis added.)

**{¶ 167}** Defense counsel challenged Juror 1830 for cause under *Morgan*, arguing: "He may have said the right words; but if you listen to what he really said, I think it's pretty clear that he will not follow the Court's instructions. He's made up his mind as to what the proper sentence should be." The trial court overruled the challenge, finding that Juror 1830's answers did not "show that he

has an inability or an unwillingness to follow the Court's instructions." Instead, the trial court found that Juror 1830 "would consider circumstances."

{¶ 168} Juror 1830 gave contradictory answers in his questionnaire and on voir dire. Some of his answers stated that the death penalty for robbery-murder should not be automatic and that "circumstances," such as why the defendant committed the crime, should be considered. Other answers indicated that death should be automatic if the defendant was found guilty. At still other times, Juror 1830 indicated that he did not know what he would do.

{¶ 169} The record supports the trial court's ruling on the challenge for cause. It is not clear whether Juror 1830 personally favored an automatic death sentence for felony-murder, because he gave contradictory answers on this point. Nevertheless, he clearly stated that he could set his personal opinions aside, follow whatever instructions the trial court would give, and weigh the mitigating factors.

{¶ 170} Perez argues that Juror 1830's answers to "general questions of fairness and impartiality," *Morgan,* 504 U.S. at 735, 112 S.Ct. 2222, 119 L.Ed.2d 492, cannot negate his responses indicating that he would automatically vote for death. *Morgan* cautions that "automatic death" jurors, when asked "general questions of fairness and impartiality," may honestly believe they can uphold the law, "personally confident that such dogmatic views are fair and impartial," and not realizing that refusal to consider mitigation is inconsistent with law. Id.

{¶ 171} But here, the juror was not merely making a general promise to be fair or to uphold the law. Rather, he specifically agreed that he could follow the trial court's instructions "as to the factors to consider," that he could fairly consider, *and weigh*, both the aggravating circumstances and mitigating factors as the judge instructed, and that he could set aside his personal opinions in doing so.

{¶ 172} Even defense counsel granted that the juror "may have said the right words." Here, then, was a question of fact for the trial court to resolve:

whether the juror meant what he said. *State v. Jones* (2001), 91 Ohio St.3d 335, 339, 744 N.E.2d 1163. As the trier of fact, the trial judge was entitled to accept Juror 1830's specific assurances that he would consider the mitigating factors in accordance with the trial court's instructions. Cf. *State v. Gross*, 97 Ohio St.3d 121, 2002-Ohio-5524, 776 N.E.2d 1061, ¶ 38 (trial judge entitled to accept juror's assurance that she would decide case based on the evidence).

{¶ 173} The trial court's findings were supported by substantial testimony and therefore did not constitute an abuse of its discretion. *State v. Wilson* (1972), 29 Ohio St.2d 203, 211, 58 O.O.2d 409, 280 N.E.2d 915. Based on the totality of the voir dire, the trial court could properly conclude that regardless of his personal views, Juror 1830 would consider mitigating factors in accordance with the instructions and thus would not automatically vote for death. Hence we overrule Perez's seventh proposition of law.

## IX. *Penalty-Phase Issues*

### A. Merger of Death Specifications

{¶ 174} In his ninth proposition of law, Perez contends that the trial court should have merged the two death specifications and thus permitted the jury to weigh only the course-of-conduct specification in the penalty phase. See generally *State v. Jenkins* (1984), 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, paragraph five of the syllabus (two or more aggravating circumstances will be merged where they arise from same act or indivisible course of conduct).

{¶ 175} Perez's claim is meritless. We have repeatedly held that "specifications for multiple-murder and for felony-murder represent distinct and separate aggravating circumstances" are not duplicative and do not merge. *State v. Smith* (1997), 80 Ohio St.3d 89, 116, 684 N.E.2d 668. See also *State v. Monroe*, 105 Ohio St.3d 384, 2005-Ohio-2282, 827 N.E.2d 285, ¶ 70; *State v. Franklin*, 97 Ohio St.3d 1, 2002-Ohio-5304, 776 N.E.2d 26, ¶ 51-52. We overrule Perez's ninth proposition of law.

*B. Scope of Proportionality Review*

{¶ 176} In his 11th proposition of law, Perez argues that his death sentence is disproportionate because neither Cecil Howard (who participated in the Beverage Oasis robbery) nor Debra Perez (who purchased the gun Perez used to kill Johnson) was sentenced to death. But neither Howard nor Debra Perez was charged with or convicted of aggravated murder. Their cases are not "similar cases" for proportionality-review purposes. See *State v. Hutton*, 100 Ohio St.3d 176, 2003-Ohio-5607, 797 N.E.2d 948, ¶ 94. We overrule Perez's 11th proposition of law.

## X. Prosecutorial Misconduct

{¶ 177} In his tenth proposition of law, Perez contends that his conviction and/or death sentence should be reversed because of prosecutorial misconduct in both the guilt and penalty phases.

{¶ 178} *Alleged vouching*: Perez contends that the prosecutor, in his guilt-phase closing argument, made two statements that improperly vouched for the police investigation.

{¶ 179} The prosecutor explained, "We go through a number of items with him [Sergeant Haytas, a police witness who secured evidence at the Beverage Oasis], things that they did not recover. Why are we doing that? We did that because * * * all you folks watch CSI. Everybody expects that our technicians are going to be able to find everything that they do on your weekly television show.

{¶ 180} "When I put evidence in before you as to what we didn't find, that's why, to let you know that we tried, that *those officers are doing their job as well as they can possibly do it*." (Emphasis added.) The defense did not object to this remark.

{¶ 181} Because Perez failed to object at trial, this claim is waived unless the statement was plain error. An alleged error is plain error only if the error is

"obvious," *State v. Barnes* (2002), 94 Ohio St.3d 21, 27, 759 N.E.2d 1240, and "but for the error, the outcome of the trial clearly would have been otherwise." *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraph two of the syllabus.

{¶ 182} No plain error existed here. First, it is far from obvious that the prosecutor's statements constituted improper vouching. "Vouching occurs when the prosecutor implies knowledge of facts outside the record or places his or her personal credibility in issue." *State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31, ¶ 232. The prosecutor's statement that police were "doing their job as well as they can" in investigating this case does not appear to fit this definition. The remark addressed not the credibility of the witnesses, but the thoroughness of the investigation.

{¶ 183} Moreover, the statement was based on the evidence at trial, not on outside-the-record evidence or the prosecutor's experience or personal opinion. "The state was entitled to present evidence regarding its methods of investigation * * * and to refer to that evidence in opening statement." *State v. Skatzes*, 104 Ohio St.3d 195, 2004-Ohio-6391, 819 N.E.2d 215, ¶ 183.

{¶ 184} Second, the prosecutor's statement was not "clearly outcome-determinative." *State v. Sanders* (2001), 92 Ohio St.3d 245, 268, 750 N.E.2d 90. The evidence of Perez's guilt, including his confession, was overwhelming.

{¶ 185} A second instance of alleged vouching came when the prosecutor, discussing Perez's taped conversations with Debra, said: "[T]he police had a wonderful plan because they've brought evidence in to you that's as powerful as it comes." Again, the defense did not object.

{¶ 186} And again, the comment was not plain error. First, the statement was not obviously erroneous. On its face, it was a comment on the strength of the state's evidence ("as powerful as it comes"). The comment that the police had a "wonderful plan" was specifically linked to the evidence (the plan was

"wonderful" *because* it obtained "powerful" evidence), did not imply knowledge of facts outside the record, and did not place the prosecutor's personal credibility in issue. Nor was it clearly outcome-determinative in light of the overwhelming evidence of guilt.

{¶ 187} *"Other Acts" Evidence*: Perez contends that the prosecutor committed misconduct by introducing evidence of the nonfatal bar robberies. We disagree. We have already rejected Perez's claim that this evidence was erroneously admitted. Moreover, even had its admission been erroneous, it is not prosecutorial misconduct to introduce evidence that the trial court has determined to be admissible. Cf. *State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, ¶ 163 (it was not misconduct "for the prosecutor to engage in conduct that the trial court had discretion to allow and did allow").

{¶ 188} Perez also argues that the prosecutor committed misconduct by presenting evidence regarding only Howard in the Beverage Oasis robbery. Perez argues that this evidence was irrelevant. We disagree. Perez was charged with attempting to kill Conley during the Beverage Oasis robbery. In his confession, Perez stated that an accomplice had participated in that robbery and was wounded during the shootout with Conley. Hence, evidence of Howard's guilt, and especially of his wounding, corroborated Perez's confession. This information was relevant to proving Perez guilty of attempted murder (and thus of the course-of-conduct specification).

{¶ 189} *"Course of Conduct" Argument*: In his closing argument, the prosecutor stated:

{¶ 190} "Most of you are employed or work. I mean your job is your course of conduct. If you're a mailman, you get up, you get your bag, and you put mail in the prescribed addresses' [sic] mailbox. That is a course of conduct. That's what you do. If you're a truck driver, you take a load from one place to another, you drop it off. That is your course of conduct. You do this on a regular

basis.  This is how you support yourself.  It's a course of conduct.  And that's what this Defendant does.  He robs.  That's his course of conduct."

{¶ 191}  The prosecutor appeared to be arguing that the series of aggravated robberies itself constituted the "course of conduct" with which Perez was charged in this case.  Perez contends that this argument misstated the law.  Again, however, Perez did not object to it at trial.  Thus, his claim is waived unless the prosecutor's argument was plain error.

{¶ 192}  The trial judge correctly instructed the jury regarding what constitutes a "course of conduct."  He instructed that the jury "must find * * * that the aggravated murder was part of a course of conduct *involving a purposeful killing of or an attempt to kill two or more persons*."  (Emphasis added.)  He continued:

{¶ 193}  "In order to find that two or more offenses constitutes [sic] a single course of conduct, you * * * must discern some connection, common scheme, or some pattern or psychological thread that ties the offenses together.  Thus, for instance, the factual link might be one of time, location, *murder weapon, or cause of death*.  It might involve the *killing* of victims who are close in age or who are related.  It might involve a similar motivation on the *killer's* part for his crimes, a common getaway car, or perhaps a similar pattern of secondary crimes *involving each victim*." (Emphasis added.)

{¶ 194}  The emphasized language in this instruction made it clear to the jury that a "course of conduct" for purposes of the R.C. 2929.04(A)(5) specification is not simply any regular pattern of activity, such as robbery, but must involve the purposeful killing or attempted killing of two or more persons.

{¶ 195}  Moreover, the evidence of guilt was overwhelming as to the course-of-conduct specification.  There was no question that Perez murdered Johnson and tried to kill Conley.  Given the surrounding circumstances, the murder of Johnson and attempted murder of Conley clearly constituted "a course

40

of conduct involving the purposeful killing of or attempt to kill two * * * persons." R.C. 2929.04(A)(5). (See our discussion of Perez's second proposition of law.)  Thus the prosecutor's argument was not plain error, because it was not clearly outcome-determinative.

{¶ 196}  *Intent Argument*: Perez also argues that the prosecutor committed misconduct by arguing that "intent was demonstrated by Perez's statements made after the crime which demonstrated lack of remorse." The prosecutor quoted Robby Smith's testimony that Perez had told him Johnson "was gurgling" after being shot.  The prosecutor argued "that somebody doesn't make that kind of comment to their stepson * * * unless they're proud of what they did.  It's another statement of intent." Perez did not object at trial, so this issue is waived absent plain error.

{¶ 197}  We find no plain error.  Both prosecutors and defense counsel are entitled to "wide latitude in summation as to what the evidence has shown and what reasonable inferences may be drawn therefrom."  *State v. Stephens* (1970), 24 Ohio St.2d 76, 82, 53 O.O.2d 182, 263 N.E.2d 773.   The prosecutor's inference here was not unreasonable.  Indeed, we think it quite logical to suppose that a person who had killed someone unintentionally would regret it – or at any rate would not boast or speak flippantly about it.  Perez also argues that by making the above argument, the prosecutor "purposefully misstated the evidence." Here, Perez is simply wrong.

{¶ 198}  *Penalty-phase arguments:*  Perez claims that the prosecutor committed three acts of misconduct in the state's penalty-phase closing argument. Perez did not object to any of these arguments at trial and thus cannot prevail unless one of them constituted plain error.  We find no plain error in the cited remarks.  Hence, Perez's claim is waived.

{¶ 199}  Perez's tenth proposition of law is overruled.

## XI. Ineffective Assistance of Counsel

**{¶ 200}** In his sixth proposition of law, Perez claims that he received ineffective assistance from his trial counsel. To establish ineffective assistance, Perez must show (1) deficient performance by counsel, i.e., performance falling below an objective standard of reasonable representation, and (2) prejudice, i.e., a reasonable probability that but for counsel's errors, the proceeding's result would have been different. *Strickland v. Washington* (1984), 466 U.S. 668, 687-688, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674; *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraphs two and three of the syllabus.

**{¶ 201}** Perez divides his ineffective-assistance claims into four categories: voir dire, guilt phase, penalty phase, and failures to object.

**{¶ 202}** *Voir Dire:* Perez contends that his counsel performed deficiently by failing to question the jurors about racial bias.

**{¶ 203}** At trial, Perez's stepson testified that Perez had told him that he had shot Ronald Johnson because Johnson "called him the N word." Perez made a similar claim in his confession to police. On the other hand, three witnesses to the murder testified at trial, and none of them mentioned any such slur. They did, however, describe the assailants as having covered themselves in black, including toboggan masks and gloves. In closing argument, the state briefly mentioned the alleged racial slur while discussing Perez's motives for shooting Johnson.

**{¶ 204}** Perez claims his counsel rendered ineffective assistance by failing to ask prospective jurors whether they would harbor any bias against Perez because his victim, Johnson, was white. (Perez's race is not clear from the record.) According to Perez, the existence of a racial issue made it "essential" that defense counsel question the venire on racial prejudice. Cf. *Turner v. Murray* (1986), 476 U.S. 28, 36-37, 106 S.Ct. 1683, 90 L.Ed.2d 27 (capital defendant accused of interracial crime is entitled, upon request, to have prospective jurors informed of the victim's race and questioned on racial bias).

**{¶ 205}** Perez cites *Turner* as a case vacating a death sentence because of a "risk" that racial prejudice may have affected the sentencing. But his reliance on *Turner* is misplaced. "*Turner* held only that the defense was *entitled* to engage in racial-bias inquiry, not that defense counsel *must* do so in order to effectively assist their client." (Emphasis added.) *State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, ¶ 218.

**{¶ 206}** Instead of automatically finding ineffective assistance because defense counsel did not conduct voir dire on possible racial bias, we must apply the usual *Strickland* test for ineffective assistance. In doing so, we are mindful that "[c]ounsel's actions during *voir dire* are presumed to be matters of trial strategy." *Miller v. Francis* (C.A.6, 2001), 269 F.3d 609, 615. Thus, we have recognized that "the actual decision to voir dire on racial prejudice is a choice best left to a capital defendant's counsel." *State v. Smith* (2000), 89 Ohio St.3d 323, 327, 731 N.E.2d 645, citing *Turner*, 476 U.S. at 37, 106 S.Ct. 1683, 90 L.Ed.2d 27, and fn.10. "In these situations, we normally defer to counsel's judgment." *Smith* at 328.

**{¶ 207}** In this case, it was neither deficient nor prejudicial for counsel to decline to ask racial-bias questions. To begin with, defense counsel had to weigh the risks inherent in interrogating prospective jurors on the sensitive question of racial prejudice. See *Smith*, 89 Ohio St.3d at 328, 731 N.E.2d 645; *Commonwealth v. Henry* (1997), 550 Pa. 346, 368, 706 A.2d 313.

**{¶ 208}** Here, there was little reason for defense counsel to run these risks, because racial issues were not central to this case. There were only three direct references at trial to Perez's racial-slur allegation; each reference was brief, and none of them came from the eyewitness testimony. Because racial issues were peripheral to the trial of this case, defense counsel could quite reasonably determine that the potential costs of conducting voir dire on racial prejudice

outweighed any possible benefit from such a course. Accordingly, we find no deficient performance, and we reject this ineffective-assistance claim.

{¶ 209} *Guilt Phase*: During his opening statement, Perez's counsel stated that Perez had confessed "because he knew that there's no dispute about what happened. There is no serious dispute about what happened or who did it. Mr. Perez knows that in all probability, you 12 jurors will reach the second phase of this trial and you will deliberate on whether to put him to death or not." Perez contends that it was ineffective assistance to concede guilt, particularly since he claims there were "valid issues concerning the validity of the course of conduct charge" that defense counsel should have argued to the jury.

{¶ 210} "Conceding guilt in a capital case does not necessarily constitute deficient performance." *State v. Johnson*, 112 Ohio St.3d 210, 2006-Ohio-6404, 858 N.E.2d 1144, ¶ 134, citing *Florida v. Nixon* (2004), 543 U.S. 175, 190-191, 125 S.Ct. 551, 160 L.Ed.2d 565. "Attorneys representing capital defendants face daunting challenges in developing trial strategies, not least because the defendant's guilt is often clear. * * * In such cases, 'avoiding execution [may be] the best and only realistic result possible.' " *Nixon*, 543 U.S. at 191, 125 S.Ct. 551, 160 L.Ed.2d 565, quoting ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, Section 10.9.1, Commentary (Rev.Ed.2003), reprinted in 31 Hofstra L.Rev. (2003) 913, 1040.

{¶ 211} In this case, Perez's guilt was clear. In his videotaped confession to police, he admitted that he killed Johnson during the Do Drop Inn robbery and fired at Conley during the Beverage Oasis robbery. This confession was supplemented by his admissions to his wife (which defense counsel unsuccessfully sought to exclude), daughter, and stepson.

{¶ 212} Other evidence strongly corroborated Perez's guilt. Eyewitness accounts of the robberies were basically consistent with Perez's admissions. George Remmer's shotgun, which Perez had borrowed, was found at the

Beverage Oasis. A month before the Do Drop Inn robbery, Perez's wife had bought a .357 Magnum – the same kind of gun Perez admitted using to kill Johnson. Two days after that robbery, she got rid of the Magnum. Perez said that Cecil Howard had been "shot in the butt" in the Beverage Oasis shootout; Howard indeed carried a bullet in his body in the same general area that Perez had mentioned. Robby Smith testified that Perez kept masks in his closet and that he had seen Perez with a mask. Given this evidence, it was rational for defense counsel to concede that Perez had committed the acts in question.

**{¶ 213}** But Perez argues that his attorneys should have at least contested the course-of-conduct specification, rather than conceding that the jury would probably "reach the second phase of [the] trial." However, the evidence clearly established the existence of a course of conduct involving two intentional killings or attempts to kill. (See the discussion of Perez's first proposition of law.) Moreover, Perez ignores the fact that he was charged with *two* death specifications, and the felony-murder specification was also supported by overwhelming evidence. Thus, even had counsel elected to challenge the course-of-conduct specification, they could still rationally concede that "in all probability," the trial would reach the penalty phase.

**{¶ 214}** *Confession*: Next, Perez argues that his attorneys erred when they "emphasized" his taped confession in their opening and closing statements, because the confession was "damaging evidence." However, the defense strategy was to concede that Perez had killed Johnson, to try the guilt phase on the issue of intent to kill, and simultaneously to stress possible mitigating factors, such as remorse, in anticipation of the penalty phase.

**{¶ 215}** Defense counsel's references to the confession were consistent with that strategy. Counsel argued that the confession showed Perez's remorse, which is a mitigating factor, and that the confession indicated a lack of intent on his part to kill Johnson. Defense counsel could not prevent the jury from

considering that confession. They had tried, and failed, to get it suppressed. Hence, it was reasonable, and not deficient performance, to stress any favorable facts or inferences that might be strained from it.

{¶ 216} *Cross-examination*: Perez claims that his counsel did not adequately cross-examine Debra. Perez notes that Debra was not charged with any crimes even though she had bought guns for him, treated his wound after the Beverage Oasis shootout, and disposed of the murder weapon. Thus, Perez argues that his counsel, when cross-examining Debra, should have focused on whether the state had promised her immunity.

{¶ 217} Perez fails to show prejudice on this issue. Nothing in the record justifies an inference that the state promised Debra immunity. Thus, Perez can only speculate on what Debra's response to such questions would have been. Such speculation is insufficient to establish ineffective assistance. *State v. Were*, 118 Ohio St.3d 448, 2008-Ohio-2762, 890 N.E.2d 263, ¶ 219. See also *State v. Elmore*, 111 Ohio St.3d 515, 2006-Ohio-6207, 857 N.E.2d 547, ¶ 121 (failure to call witness was not ineffective assistance when it was totally speculative whether witness could have given favorable testimony).

{¶ 218} Perez also argues that his counsel should have cross-examined Debra regarding the taped conversations between her and Perez. But he never says what he thinks they should have asked her. Presumably, Perez means to argue that his counsel should have cross-examined Debra about statements she made during those conversations. (See the discussion of Perez's fifth proposition of law.) But if that is Perez's intended argument, he fails to support it by pointing to any particular statements that counsel should have cross-examined Debra about. Perez's vague claim gives us no basis on which we can either evaluate counsel's performance or address the question of prejudice.

{¶ 219} Finally, Perez claims that his counsel should have requested an accomplice-testimony instruction as to Debra. But as we explained in discussing

Perez's eighth proposition of law, Perez was not entitled to such an instruction. See *State v. Wickline* (1990), 50 Ohio St.3d 114, 118, 552 N.E.2d 913 ("at the very least, an 'accomplice' must be a person indicted for the crime of complicity"). Hence, this claim fails to establish either deficient performance or prejudice under *Strickland*.

{¶ 220} *Penalty Phase*: An attorney who fails to conduct a reasonable investigation into the defendant's history and background provides ineffective assistance. Perez contends that his trial counsel presented inadequate mitigating evidence as a result of their inadequate investigation of his history and background. *State v. Dixon*, 101 Ohio St.3d 328, 2004-Ohio-1585, 805 N.E.2d 1042, ¶ 60, citing *Wiggins v. Smith* (2003), 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471, and *Williams v. Taylor* (2000), 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389.

{¶ 221} Defense counsel called only one witness in the penalty phase: Ray J. Paris, Perez's stepfather, whose testimony on direct examination occupies only about four pages of transcript. Paris testified that Perez's parents were not around much during his childhood and that Perez's late mother had been a prostitute. He also begged the jury to spare Perez's life.

{¶ 222} Perez contends that defense counsel should have presented "information to assist [the jury] in understanding the dynamic within the family or the family history of dysfunction." Perez further contends that counsel should have investigated his possible "mental health issues" on the basis of Perez's recorded statements. In a taped conversation with Debra, Perez mentioned that he had been found competent to stand trial on the unrelated case in which he was being held. In his confession, he told detectives that he had "major mental issues" and took "eight pills every night" for "[b]ipolar, mental psychosis." But he also said that he had not been on any medication and was not having any "issues" on the night of the murder.

**{¶ 223}** Perez has the burden of demonstrating that his counsel rendered ineffective assistance. *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052, 80 L.Ed.2d 674; *State v. Gondor*, 112 Ohio St.3d 377, 2006-Ohio-6679, 860 N.E.2d 77, ¶ 62.

**{¶ 224}** Perez cites nothing in the record to show that his counsel conducted a less than adequate investigation. The record shows that the court granted Perez's motion to hire a defense investigator, a psychologist, and a mitigation specialist. Beyond that, the record does not show the extent of counsel's investigation.

**{¶ 225}** We also note that Perez underwent a competency evaluation in this case. The resulting psychiatric report states that Perez was raised in group homes and juvenile facilities and that he reported a childhood history of physical abuse and marijuana use. Perez also reported hallucinations and suicidal and paranoid ideation. The report also cites indications of malingering and concludes that Perez had no serious psychiatric disorder.

**{¶ 226}** While this report shows some possible mitigating factors, the record does not show that Perez's counsel failed to investigate those factors. We "cannot infer a defense failure to investigate from a silent record." *State v. Were*, 118 Ohio St.3d 448, 2008-Ohio-2762, 890 N.E.2d 263, ¶ 244. Thus, the record fails to support Perez's claim of ineffective assistance.

**{¶ 227}** Perez also claims that his counsel's penalty-phase argument discounted the importance of what mitigating evidence did exist concerning his childhood and mental health. Defense counsel stated: "We told you when we started this case his [Johnson's] death was senseless, and we offer no excuses. It's not anybody else's fault but Kerry Perez. We told you that when we started. I tell you that again today."

**{¶ 228}** "[H]is mom was a prostitute; that's not an excuse. We wanted you to know some of the things about his childhood, but that's not an excuse. That didn't cause him to do what he did, and so I make no excuse."

**{¶ 229}** This line of argument appears to reflect a decision to downplay Perez's background as a mitigating factor while emphasizing other factors, such as Perez's cooperation with the police and his loyalty to his wife. By doing so, defense counsel was able to project an image of candor, reason, and acceptance of responsibility, without making any really damaging concession. This decision was not professionally unreasonable. Moreover, Perez fails to show prejudice, as it cannot be said that there was a reasonable likelihood of a different outcome in the penalty phase had defense counsel eschewed the "no excuses" argument.

**{¶ 230}** *Failure to object and failure to request instructions*: Perez claims that defense counsel rendered ineffective assistance by failing to object to alleged prosecutorial misconduct in both phases of trial, as discussed in regard to his eighth and tenth propositions of law. However, defense counsel's failure to object does not necessarily constitute ineffective assistance, and we have found no error.

**{¶ 231}** Perez contends that his counsel's failure to object to allegedly improper jury instructions on other-acts evidence was ineffective assistance. But for the reasons stated previously, we find no error.

**{¶ 232}** In sum, Perez fails to demonstrate ineffective assistance. His sixth proposition of law is overruled.

## XII. Settled Issues

**{¶ 233}** In part D of his first proposition, Perez claims that the R.C. 2929.04(A)(5) course-of-conduct specification is unconstitutionally vague. We summarily reject this claim. See *State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, ¶ 239.

**{¶ 234}** In his 12th proposition, Perez attacks the trial court's reasonable-doubt instructions, which the court gave in accordance with R.C. 2901.05. We have repeatedly rejected such arguments. See *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565, ¶ 122. See also *Buell v. Mitchell* (C.A.6, 2001), 274 F.3d 337, 366. Perez's 12th proposition is overruled.

{¶ 235} In his 13th proposition, Perez attacks the constitutionality of Ohio's death-penalty statutes. We have repeatedly rejected these claims. See *State v. Jenkins*, 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, paragraph one of the syllabus; *State v. Mapes* (1985), 19 Ohio St.3d 108, 116-117, 19 OBR 318, 484 N.E.2d 140; *State v. Buell* (1986), 22 Ohio St.3d 124, 137-138, 22 OBR 203, 489 N.E.2d 795; *State v. Steffen* (1987), 31 Ohio St.3d 111, 125, 31 OBR 273, 509 N.E.2d 383; *State v. Durr* (1991), 58 Ohio St.3d 86, 97, 568 N.E.2d 674; *State v. Mills* (1992), 62 Ohio St.3d 357, 374-376, 582 N.E.2d 972; *State v. Lorraine* (1993), 66 Ohio St.3d 414, 426, 613 N.E.2d 212; *State v. Phillips* (1995), 74 Ohio St.3d 72, 101, 103-104, 656 N.E.2d 643. They are summarily overruled. See *State v. Poindexter* (1988), 36 Ohio St.3d 1, 520 N.E.2d 568, syllabus; *State v. Spisak* (1988), 36 Ohio St.3d 80, 82, 521 N.E.2d 800.

### XIII. Independent Sentence Review

{¶ 236} Under R.C. 2929.05, we must independently review Perez's death sentence. The court must determine whether the evidence supports the jury's finding of aggravating circumstances, whether the aggravating circumstances outweigh the mitigating factors, and whether the death sentence is proportionate to those affirmed in similar cases.

*A. Aggravating Circumstance*

{¶ 237} Perez was convicted of two aggravating circumstances: course of conduct, R.C. 2929.04(A)(5), and felony-murder, R.C. 2929.04(A)(7). The evidence supports Perez's convictions of both specifications.

*B. Mitigating Factors*

{¶ 238} In the penalty phase, Perez waived his right to make an unsworn statement and called only one witness: his stepfather, Ray J. Paris. Paris has known Perez since Perez was four years old, when Paris married Perez's mother, Mary Lee. Although Paris and Mary Lee "split up after two years," Perez continued to live with Paris until age 12.

{¶ 239} Paris testified that Perez's father "was never around him that much." Perez's mother also "wasn't around him." She was engaged in prostitution and was arrested for that offense in Springfield and in Columbus, Kentucky. She had been dead for about 20 years at the time of the trial.

{¶ 240} Paris testified that he had provided a "very good home" for Perez until Perez was 12, that he "watched out for" Perez "quite a bit" even after Perez no longer lived with him, and that he had been a mentor for Perez and had always remained available for Perez to talk to, even up to the present day. On cross-examination, Paris testified that he had also mentored other youths and had raised several of his own children, who had all turned out "real well." Paris further testified that he had set an example for Perez by working, serving in the Army, and being involved in the community.

{¶ 241} Finally, Paris begged the jury to spare Perez's life. He testified that he had come to the trial, even though it was physically difficult for him: "It's very important that I be here."

{¶ 242} At the request of the defense, the trial judge instructed on the following factors as mitigating: "The nature and circumstance of the offense; the history, character, and background of the Defendant; and his remorse; his willingness to step forward and take responsibility for his actions without any offer of leniency by the State; his assistance to and cooperation with the police; his probability of no release from prison; his family history and background; his poor family environment." In closing argument, defense counsel stressed Perez's loyalty to his wife in confessing so that she would not be arrested and also mentioned his loyalty to Cecil Howard, his crime partner.

### C. Weighing

{¶ 243} No mitigating factors appear in the nature and circumstances of the offense. Perez shot Johnson during an armed robbery. Even had Johnson forcibly resisted the robbery, that fact would not be mitigating. See *State v. Clark*

(1988), 38 Ohio St.3d 252, 263, 527 N.E.2d 844.  But Johnson did not resist.  Discounting Perez's uncorroborated and self-serving claim about the racial slur, Perez admitted that he shot Johnson simply because "[h]e looked and [he] moved."

**{¶ 244}** Perez's difficult childhood – a broken home, absent parents – is a mitigating factor.  See, e.g., *State v. White* (1999), 85 Ohio St.3d 433, 456, 709 N.E.2d 140.  It is true that Perez was somewhat luckier than others in similar circumstances, in that he apparently  had a decent and caring stepfather to help raise him.  However, he lived with his stepfather only until he was 12.

**{¶ 245}** Nevertheless, we "have seldom given decisive weight to" a defendant's unstable or troubled childhood.  *State v. Hale,* 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, ¶ 265.  We note that Perez was 37 years old when he killed Johnson.  In other words, "[h]e had reached 'an age when * * * maturity could have intervened,' and [Perez] 'had clearly made life choices as an adult before committing [this] murder.' " *State v. Campbell* (2002), 95 Ohio St.3d 48, 53, 765 N.E.2d 334, quoting *State v. Murphy* (1992), 65 Ohio St.3d 554, 588, 605 N.E.2d 884 (Moyer, C.J., dissenting).

**{¶ 246}** Perez had the love and support of his stepfather. A capital defendant's sharing a loving, caring relationship with a close family member may be a mitigating factor under R.C. 2929.04(B)(7) (other factors relevant to the issue). See *State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, ¶ 263.

**{¶ 247}** "A defendant's confession and cooperation with law enforcement are mitigating factors." *State v. Bethel*, 110 Ohio St.3d 416, 2006-Ohio-4853, 854 N.E.2d 150, ¶ 191.  However, we assign little weight in mitigation to Perez's confession.  Perez initially lied to police, denying his own guilt and trying to blame John McGhee.  Cf. *State v. Fox* (1994), 69 Ohio St.3d 183, 195, 631 N.E.2d 124 (defendant confessed only after initially denying involvement;

confession entitled to no weight); *State v. Hoffner*, 102 Ohio St.3d 358, 2004-Ohio-3430, 811 N.E.2d 48, ¶ 119 (defendant confessed, but had previously misled police as to his involvement). He did not confess until the investigating officers convinced him that they could prove his guilt. Id. (defendant confessed only after being implicated in the crime).

{¶ 248} Perez's loyalty to his wife – his willingness to ultimately confess in order to save her from trouble he helped get her into – may arguably be entitled to some weight under R.C. 2929.04(B)(7). It indicates, at least, some sense of responsibility for someone other than himself. On the other hand, his initial lying diminishes the weight of this factor. On balance, this factor is not impressive.

{¶ 249} The record contains some evidence of remorse. In his confession, Perez expressed a "whole bunch" of "regrets." He said he "thought about this * * * every night": "Kick myself * * * every night." He wished the murder had not taken place or that he could "take it back." He said he felt better for having confessed.

{¶ 250} Similarly, in his tape-recorded phone conversation with Debra after his confession, Perez said that he had been "thinking about this," and confessing had "lifted off" a "big weight." He remarked that "[t]here's a family out there that wants to know why that guy was killed * * *."

{¶ 251} In his August 23, 2004 letter to Sherry Alspaugh, Perez wrote: "About killing that guy. I feel very bad for that, that's something that I never wish to have taken place. But I also know there isn't anything I can do about it. How would you feel about me if all I did was cry & cry some more about everything I ever did? That just isn't me!"

{¶ 252} The sincerity and depth of Perez's remorse is questionable. His tardy, half-hearted, and self-serving expressions of remorse are belied by his callous and flippant attitude just after the murder. Remorse deserves very slight weight in this case.

*D. Proportionality*

**{¶ 253}** Finally, under our duty to independently consider whether the sentence imposed herein is "excessive or disproportionate to the penalty imposed in similar cases," R.C. 2929.05, we find that Perez's death sentence is neither excessive nor disproportionate. We have upheld death sentences in several cases combining a course-of-conduct specification with a robbery-murder specification. See *State v. Beuke* (1988), 38 Ohio St.3d 29, 45, 526 N.E.2d 274 (course of conduct involved one murder and two attempted murders); *State v. Hicks* (1989), 43 Ohio St.3d 72, 81, 538 N.E.2d 1030; *State v. Montgomery* (1991), 61 Ohio St.3d 410, 419, 575 N.E.2d 167; *State v. Hawkins* (1993), 66 Ohio St.3d 339, 351, 612 N.E.2d 1227; *State v. Otte* (1996), 74 Ohio St.3d 555, 568-569, 660 N.E.2d 711; *State v. Palmer* (1997), 80 Ohio St.3d 543, 577, 687 N.E.2d 685.

**{¶ 254}** Indeed, we have approved death sentences in cases involving only a robbery-murder specification. See, e.g., *State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, ¶ 278; *State v. Lindsey* (2000), 87 Ohio St.3d 479, 492, 721 N.E.2d 995; *State v. Post* (1987), 32 Ohio St.3d 380, 395, 513 N.E.2d 754, fn. 10. We have also approved death sentences in cases involving a course-of-conduct specification when, as here, the defendant committed one murder and one attempted murder. See *State v. Jenkins*, 15 Ohio St.3d at 210, 15 OBR 311, 473 N.E.2d 264; *State v. Sowell* (1988), 39 Ohio St.3d 322, 337, 530 N.E.2d 1294; *State v. Dennis* (1997), 79 Ohio St.3d 421, 437, 683 N.E.2d 1096; *State v. Filiaggi* (1999), 86 Ohio St.3d 230, 253, 714 N.E.2d 867.

**{¶ 255}** The judgment of the trial court is affirmed.

Judgment affirmed.

MOYER, C.J., and LUNDBERG STRATTON, O'CONNOR, O'DONNELL, and LANZINGER, JJ., concur.

PFEIFER, J., concurs in part and dissents in part.

————————————

**PFEIFER, J., concurring in part and dissenting in part.**

{¶ 256} I concur in judgment. I write separately to emphasize aspects of the majority opinion that I find troubling.

{¶ 257} I continue to be concerned about how prosecutors employ and this court addresses course-of-conduct death specifications. In this case, it is clear beyond a reasonable doubt that the murder occurred during an aggravated robbery, R.C. 2929.04(A)(7). This death specification was sufficient to procure a death sentence, rendering it unnecessary for the prosecutor to charge Perez with an attenuated course-of-conduct death specification under R.C. 2929.04(A)(5). See *State v. Sapp*, 105 Ohio St.3d 104, 2004-Ohio-7008, 822 N.E.2d 1239, at ¶ 130 (Pfeifer, J., dissenting); *State v. Scott*, 101 Ohio St.3d 31, 2004-Ohio-10, 800 N.E.2d 1133, at ¶ 111-116 (Pfeifer, J., dissenting).

{¶ 258} If this court continues to treat course-of-conduct specifications as expansively as it has, no jeopardy is likely to befall the prosecutors bringing them. Nevertheless, charging a course-of-conduct death specification when another specification is chargeable and relatively easy to prove is unnecessary to effect justice, uneconomical as to prosecutorial and judicial resources, and unlikely to benefit the public.

{¶ 259} In *Scott*, "[t]he two murders were unrelated, occurred 19 days apart, and involved two people that had no relation to each other. The two murders were not committed in a similar way, were not committed in the same transaction, and were not committed for a common reason. In short, the only thing the two murders had in common was the murderer." Id., 101 Ohio St.3d 31, 2004-Ohio-10, 800 N.E.2d 1133, at ¶ 113 (Pfeifer, J., dissenting). In *Sapp*, "[t]he murder of Anderson occurred over a year after and was not related in any way to the murders of Morrow and Leach." Id., 105 Ohio St.3d 104, 2004-Ohio-7008, 822 N.E.2d 1239, at ¶ 130 (Pfeifer, J., dissenting). In this case, the murder of Ronald Johnson occurred several months after the shooting at the Beverage Oasis.

Although both incidents involved a robbery and the use of masks and guns to effect the robbery, little else binds them. One establishment was a retail store, the other a bar; one shooting was at an owner, the other of a customer; one involved Perez chasing employees, the other did not; one involved an armed victim who shot first, the other did not; even the guns used in the two crimes were different. Although both crimes were committed at night, one was as employees were closing, and the other involved an open-for-business bar. In short, there are no particularized facts that suggest that the first and second incidents were part of a course of conduct, especially when the eight-month gap is considered. There is no factual link " 'of time, location, murder weapon, or cause of death.' " *State v. McKnight*, 107 Ohio St.3d 101, 2005-Ohio-6046, 837 N.E.2d 315, ¶ 161, quoting *Sapp* at ¶ 52. The course-of-conduct death specification in this case should not have been charged, should not have been presented to the jury, and should not be affirmed by this court.

{¶ 260} Equally troubling is that the trial court allowed the prosecution to present evidence of several robberies that did not involve murder or attempted murder to help prove the course-of-conduct death specification. The prosecutor had an extremely strong case on the aggravated-robbery specification. Why would he put this case at risk by presenting such potentially prejudicial "other acts" evidence? Why introduce evidence of crimes that did not involve a murder or attempted murder to prove a "course of conduct involving the purposeful killing of or attempt to kill two or more persons"? R.C. 2929.04(A)(5). And most important of all, why would this court stamp its imprimatur on this unnecessary and improper use of other-acts evidence?

{¶ 261} Finally, I am baffled by the treatment of the marital-communications privilege contained in R.C. 2945.42, which allows a defendant to prevent the testimony of his or her spouse "concerning a communication made by one to the other, or act done by either in the presence of the other, during

coverture." According to the majority opinion, although the privilege prohibits testimony about a spousal conversation, it does not prohibit the introduction of a tape recording of the actual conversation. What an insidious distinction! It eviscerates the intent behind the privilege and is in some ways worse than the admission of testimony. If a spouse testifies, the defendant at least has a right to cross-examine. Although I believe that the use of the tape recording was improper, I would deem the use of it to be harmless error given Perez's confession.

{¶ 262} I concur in the judgment affirming the death sentence for the aggravated-robbery death specification. I dissent as to the imposition of the death sentence for the course-of-conduct death specification.

_____

Stephen A. Schumaker, Clark County Prosecuting Attorney, for appellee.

Timothy Young, Ohio Public Defender, Pamela J. Prude-Smithers, Supervisor, Death Penalty Division, and Brie A. Friedman and Robert K. Lowe, Assistant Public Defenders, for appellant.

_____