Pfeifer, J.,
dissenting.
{¶ 268} I would reverse Jones’s convictions and order a new trial. Every criminal defendant is entitled to a fair trial. It is one of the most basic tenets of our society and our constitutional history. Jones did not get one. He is not entitled to a perfect trial, just a fair one. It matters not how sordid are the details of the crime; nor should it matter that by taking the stand, Jones probably undermined his own defense by weaving a tale that at best could be only partially true.
{¶ 269} The majority’s upholding Jones’s convictions is basically a lengthy and convoluted justification for intentional and needless error injected into the trial of Jones by the prosecutor and allowed by the trial judge. It is one thing for this court to determine that the aggressive conduct of the prosecutor led to harmless error. It is quite another matter when we open the door for continued pushing at the edges of the Rules of Evidence, statutory privilege, and constitutional duties by excusing, rather than rejecting, introduction of evidence that crosses the line.
{¶ 270} What exactly was the state’s theory of the actual events on the night of April 22, 2007, that led to the death of Susan Yates and the conviction of Phillip Jones for aggravated murder with a death-penalty specification? One assumes the state had an operative and successful theory of its case, but it is not revealed in the majority opinion. Rather, we are left with the details of the condition of Yates’s dead body and a portion of Jones’s explanation of what occurred, consensual sex, followed by rough or erotic asphyxiation and the possibly accidental death of Susan Yates.

Fair-trial Issues

{¶ 271} The prosecution’s use of a life-sized doll representing Susan Yates provided imaginative courtroom drama. The transcript suggests that Jones was required to step down from the witness stand, lie on the doll, and demonstrate for the jury how he choked Yates while having vaginal intercourse with her. Having been allowed by the judge, over objection, to conduct this eye-popping demon *61 stration, the prosecutor wasn’t finished. The prosecutor recalled Dr. George Sterbenz, the medical examiner, and then lay down on the doll, demonstrating Jones’s testimony for the doctor. That still wasn’t enough. Dr. Sterbenz left the witness stand, straddled the doll with his hands around the doll’s neck, and asked the prosecutor whether he had properly understood Jones’s testimony. Was this thrice-enacted demonstration prejudicial to the defendant Jones? Not according to the majority.
{¶ 272} It is at this point in the fair-trial inquiry that the prosecution’s entire case comes into play. Dr. Sterbenz, the medical examiner who conducted the autopsy of Susan Yates, concluded that she died from asphyxia by strangulation. It was apparently always the view of Dr. Sterbenz that it would be impossible to cause Yates’s throat injuries as a side effect of choking her. Dr. Sterbenz postulated that the injuries to Yates’s neck and throat could have been caused only by a violent skin-on-skin action, presumably from a head lock or the use of a ligature involving cloth tightened by twisting it with some object. He did not use the doll to demonstrate either theory. Thus the demonstration on the doll forced on Jones by the state and then again staged by the prosecutor and by Dr. Sterbenz’s during rebuttal served no purpose other than to inflame the jury. It was not probative of anything.

R.C. 291p5.b2 Spousal Privilege and Excited Utterance

{¶ 273} In its merit brief, the state refers to the concept of spousal privilege as “a relic of the common law.” With that attitude in mind, the prosecutor sought to ignore R.C. 2945.42, which could have prohibited Jones’s wife, Delores, from testifying about anything Jones had told her regarding the Yates matter. As part of the state’s case, Delores testified that the day Susan Yates’s body was discovered, she and her husband had a discussion about something that was on the news. She then testified that an hour or so later, she drove to the home of her friend Charletta Jeffries and, in an excited state, told Jeffries everything her husband had told her after the news program. She further testified that after she unburdened herself by telling Charletta about the conversation she had had with her husband, she then called the police and asked to speak to someone in charge about the dead woman in the cemetery. Finally, Delores, describing herself as still upset, had told Detective Richard Morrison details that Jones had told her. At this point, Delores left the stand, and the jurors were left on the edges of their respective seats.
{¶ 274} It is also at this point in the narrative that the majority offers the following apparently tongue-in-cheek observation: “Delores was not asked — and did not testify — as to the communication between her and Jones. Therefore, Delores’s testimony did not violate Jones’s spousal privilege.” What next follows are several leaps of faith that not even The Flying Wallendas would attempt.
*62 {¶ 275} First, the majority attempts to justify the wrongly decided State v. Perez, 124 Ohio St.3d 122, 2009-Ohio-6179, 920 N.E.2d 104, by discussing a Michigan case and a 116-year-old court of appeals case involving a letter written to his first wife by a defendant who was convicted of bigamy. After this intriguing bit of history, the majority abruptly concludes that based on Perez, “R.C. 2945.42 is wholly inapplicable.” Majority opinion at ¶ 130. The takeaway? Delores can completely destroy the statutory spousal privilege of the defendant, her husband Phillip Jones, simply by telling someone, anyone really, about what he had told her.
{¶ 276} Returning to the trial, the jury did not have to wait long to hear the rest of the salacious story. Charletta Jeffries quickly informed the jury that Delores had come to her home and confided that her husband had told her that he had murdered a woman named Susan, who had been found in the cemetery. Soon thereafter, the prosecution put Detective Morrison on the stand to repeat Delores’s account of the putative privileged conversation between herself and the defendant regarding Yates’s death.
{¶ 277} The Confrontation Clause of the Sixth Amendment to the United States Constitution must be addressed before the court can condone the hearsay testimony of Jeffries and Morrison about defendant Jones’s conversation with bis wife. The majority correctly determines that Delores is unavailable for purposes of the Confrontation Clause because Jones invoked the spousal privilege. It further correctly determines that Delores’s statements to Morrison were testimonial and that their admission into evidence violated the Confrontation Clause. I disagree with the majority’s conclusion that the admission was harmless error.
{¶ 278} The next leap is awesome. The majority examines Delores’s disclosures to Jeffries and determines that Delores “would not reasonably believe that [her] statements to her friend * * * would be available for later use at trial.” Majority opinion at ¶ 162. Never mind that Delores had immediately thereafter summoned the police detective to Jeffries’s home using Jeffries’s phone. Ignore the fact that Delores repeated the story to Detective Morrison in Jeffries’s home in the presence of Jeffries. Does the majority actually believe that Delores Jones told Charletta Jeffries that her husband told her that he “killed that girl in the cemetery,” expecting such news to remain their little secret without police or court involvement? No, the majority deftly concludes: “Delores’s statements to Jeffries were not testimonial, and their admission into evidence did not violate the Confrontation Clause.” Majority opinion at ¶ 164.
(¶ 279} Just one more leap. Hearsay. Well, not quite. More like hearsay about hearsay. Evid.R. 802 prohibits hearsay testimony. Evid.R. 803 defines specific exceptions, including the excited-utterance exception found in Evid.R. 802(2): “A statement relating to a startling event or condition made while the *63 declarant was under the stress of excitement caused by the event or condition.” Did Delores observe an event or condition? No. What she reported to Jeffries was information that her husband had told her during what should be a statutorily privileged communication. When Delores reported the conversation to Jeffries, Phillip Jones’s words were hearsay. When Jeffries testified, Jones’s words became double hearsay. Finally, to determine that Jeffries’s testimony was allowable, the majority concludes that the circumstances of the death of Susan Yates were not the startling event; rather, the startling event was hearing Jones’s statements. Hence, Delores’s confession about a confession is magically transformed from a privileged spousal conversation into an excited-utterance exception to the hearsay rule. That’s pretty neat legal prestidigitation.

Other-acts Testimony

{¶ 280} During the trial, the state was allowed to present T.J. to testify that Jones had raped her in 1990, when Jones was about 20 years old. The state was also allowed to introduce T.J.’s hospital records made at the time of the attempted rape. T.J.’s testimony was, of course, highly prejudicial to the defendant and is prohibited by Evid.R. 404(B) (prohibiting evidence of other crimes). The state argues, and the majority agrees, that T.J.’s testimony was a proper exception relating to proof of identity and proof of the absence of accident.
{¶ 281} Proof of identity is a straw man. Jones readily admitted that he caused the death of Susan Yates. Proof of absence of mistake or accident has little rational connection to Jones’s 17-year-old attempted rape of T.J. Jones claimed that he caused Yates’s death by accidently applying too much choking pressure on her throat while performing consensual erotic asphyxiation during vaginal intercourse with Yates. The best and only evidence that Yates’s death was not accidental came from Dr. Sterbenz. Jones’s conviction for attempted rape was far more remote in time than this court has ever allowed as an Evid.R. 404(B) exception. It informed the jury only that Jones had attempted to rape T.J. and that he had choked her with his hands, not with a ligature or head lock, 17 years earlier. The conclusion that the prosecutor tendered T.J.’s testimony for the purpose of proving Jones’s bad character and criminal propensity is inescapable and violates Evid.R. 404(B). Furthermore, the majority states that Jones vaginally raped T.J. even though Jones was convicted of attempted rape.

Residual Doubt and Proof Beyond a Reasonable Doubt

{¶ 282} Assisted by the fair-trial infractions outlined herein, the jury convicted Jones on all counts and recommended that he be sentenced to death. Were they correct? What actually occurred in the cemetery on April 22, 2007? Jones claimed that he and Susan Yates acquired some crack cocaine and beer and went to the cemetery, sat on a blanket, and eventually engaged in the consensual vaginal intercourse that escalated at the request of Yates into rough and erotic *64 asphyxia sex. According to Jones, that activity accidently led to Yates’s death when he applied too much choking pressure. Jones denied that he had any part in the vaginal and rectal damage to Susan Yates that was revealed by Dr. Sterbenz’s autopsy.
{¶ 283} Given the unrebutted testimony of Dr. Sterbenz regarding the cause of death and Jones’s confession, plus the testimony of Jeffries and Detective Morrison that Jones had admitted to his wife, Delores, that he had killed Susan, the jury could easily conclude, beyond a reasonable doubt, that Phillip Jones murdered Susan Yates on the night of April 22, 2007. There was no accident.
{¶ 284} But was there a rape? Jones testified he had known Yates for some time, had taken her to his home to shower when his wife was not there, and had given her money for food in the past. He testified that on the evening in question, they had acquired crack cocaine and beer, had driven to the cemetery, had spread out a blanket, and had had a good time until she died. Yates had alcohol and cocaine in her system at her death. Because there was no evidence of a struggle in Jones’s automobile, this part of his testimony is plausible. What happened next was tragic for Susan Yates. It would not be reasonable to assume that any person besides Jones was involved, but the order of events is critical.
{¶ 285} At some point, Jones killed Yates. Because Jones’s testimony on this subject is not credible, what set him off is unknown. Was that his plan from the beginning? Nothing in his past indicates a propensity for murder. Was the rough sex his idea, not hers, and did it turn to rape, then abuse, then murder to escape detection? Or at some point did she draw her knife demanding more crack or his cash? Did a fight ensue, then murder, then, in a rage, abuse of Yates’s corpse? Was it possible for the medical examiner to determine whether the gross injuries to her vagina and rectum were postmortem? If Jones had consensual sex with Yates, then murdered her, and then in a rage abused her body, there would be no death-eligible specification.
{¶ 286} This dilemma, this lack of certainty about critical events in the unfolding of the crime, is residual doubt. It is not often present in death-penalty cases. In State v. McGuire, 80 Ohio St.3d 390, 686 N.E.2d 1112 (1997), syllabus, we rejected residual doubt as a reason to overturn a death sentence, a statement of the law in which I did not concur. Id. at 405-406 (Pfeifer, J., concurring in judgment only). These many years later, this is the first case in which I would find that residual doubt should result in overturning a death sentence.

Conclusion

What Should Happen Now?

{¶ 287} With the exception of death-penalty cases, this court views the criminal-justice system from 30,000 feet. Out of the tens of thousands of serious *65 criminal cases that Ohio judges and prosecutors handle each year, we review only a few. It is our responsibility to ensure fairness by requiring judges to enforce the rules, statutes, and constitutional protections afforded every citizen accused of a crime. As we exercise oversight of this system through case review, there has been a singular constant in our direction to trial judges, prosecutors, and defense counsel: Do it right or do it over.
Sherri Bevan Walsh, Summit County Prosecuting Attorney, and Heaven DiMartino, Assistant Prosecuting Attorney, for appellee.
Nathan A. Ray and Lawrence J. Whitney, for appellant.
{¶ 288} Jones did not get a fair trial. It should be a do-over, without the doll, without any testimony about the privileged spousal conversations, and, most assuredly, without the prior-acts testimony. To affirm will embolden prosecutors to increasingly follow an aggressively edgy path to ensure convictions and to encourage judges to be accommodative with little fear of reversal.
{¶ 289} I dissent.