[Cite as *State v. Leonard*, 2017-Ohio-1541.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
ROSS COUNTY

STATE OF OHIO,                          :

    Plaintiff-Appellant,            :          Case No. 16CA3573

v.                                      :

                                                           DECISION AND

PAMELA D. LEONARD,                      :          JUDGMENT ENTRY

    Defendant-Appellee.             :          RELEASED 04/21/2017

APPEARANCES:

Matthew S. Schmidt, Ross County Prosecuting Attorney, and Pamela C. Wells, Ross County Assistant Prosecuting Attorney, Chillicothe, Ohio, for plaintiff-appellant State of Ohio.

Timothy Young, Ohio Public Defender, and Peter Galyardt, Assistant Ohio Public Defender, Columbus, Ohio, for defendant-appellee Pamela D. Leonard.

PER CURIAM.

{¶1}     Plaintiff-appellant, the State of Ohio, appeals a judgment of the Ross County Court of Common Pleas granting a motion to suppress filed by defendant-appellee, Pamela D. Leonard. On appeal, the State raises two assignments of error, arguing that (1) the trial court erred by suppressing incriminating statements and evidence because the statements and evidence were voluntarily made and handed over by Leonard, and were not obtained as a result of coercive police tactics; and (2) even if the statements and evidence were obtained involuntarily, the doctrine of inevitable discovery applies. Having reviewed the record, we agree that the incriminating evidence was not obtained as a result of police coercion; and we sustain the State's first assignment of error. Because our resolution of the State's first assignment of error is

dispositive of this case, the State's remaining assignment of error is rendered moot and we need not address it. Accordingly, we reverse the judgment of the trial court.

## I. Facts and Procedural History

{¶2}    In the late evening hours of February 6, 2015, Leonard was pulled over for a defective exhaust and for lane violations on U.S. 35 in Ross County, Ohio. An odor of marijuana emanated from Leonard's vehicle. Leonard and the passenger were eventually ordered out of the vehicle, patted down for weapons, and detained in the rear of a police cruiser.

{¶3}    Leonard and the passenger were *Mirandized* and briefly questioned regarding where they were coming from and where they were going. The passenger appeared nervous to the officers; and Leonard smelled like marijuana.

{¶4}    While Leonard and the passenger remained in the back of the police cruiser, officers conducted a search of Leonard's vehicle. During the search, officers located a large gift bag that said "The Joint" on the side. Inside the bag was a box of glass pipes, which in the officers' experience, are used to smoke crack cocaine.

{¶5}    The officers suspected that Leonard and the passenger might be concealing contraband on their bodies. The officers explained to Leonard that they would not place her in jail that night if she voluntarily surrendered the contraband to them. They would instead submit the incident to the Prosecutor's office for later indictment. Specifically, the officers explained that if she forfeited the contraband to them she would be released; they would put a case together; and the case would be submitted to the prosecutor for indictment with a summons to appear before the court. Alternatively, they explained that if she did not voluntarily give them the suspected contraband; then they would obtain a search warrant; and she would be taken to the

hospital for a body cavity search. If contraband were located, she would be arrested, charged, and held in jail until she could make bond.

{¶6}    After hearing her options, Leonard admitted to concealing cocaine on her person, retrieved the drugs from her pants, and handed over the drugs. Leonard was not arrested that night.

{¶7}    On August 28, 2015, a Ross County Grand Jury secretly indicted Leonard for possession of cocaine in violation of R.C. 2925.11, a felony of the third degree. Leonard was then arrested on a warrant accompanying her secret indictment, as opposed to being summoned on the indictment. Leonard pleaded not guilty to the charge and filed a motion to suppress the evidence seized as a result of the traffic stop and subsequent interrogation.

{¶8}    The trial court held a hearing regarding the motion to suppress on September 26, 2016. The State presented two witnesses at the hearing. The first witness was Trooper Drew Kuehne of the Ohio State Highway Patrol. Trooper Kuehne explained that he assisted in the traffic stop at issue in this case. During his testimony, Trooper Kuehne stated that he arrived approximately five minutes after Leonard's vehicle had been stopped for an alleged traffic violation. Trooper Kuehne testified that he was the officer that *Mirandized* both the passenger and Leonard. Trooper Kuehne also testified that he was the officer who located the suspected crack cocaine pipes during the search of the vehicle. On cross-examination, Trooper Kuehne was asked why he could not be heard giving Leonard her *Miranda* warnings in a dash-cam video of the traffic stop that was played and admitted as evidence at the suppression hearing. Trooper Kuehne explained that the video might not have recorded audio of what occurred outside the police cruiser because the belt microphone battery may have been dead. On examination by the trial court, Trooper Kuehne stated that when his partner was explaining to Leonard "the process

of not actually placing her in jail that night for surrendering the drugs" he stepped in and said "he's not lying to you, that is something that we do quite a bit * * *". Later in his testimony, Trooper Kuehne testified that he could be heard on the dash-cam video stating to Leonard that "the process of turning over the drugs now and coming back later is a good deal * * *."

{¶9}    Trooper Nick Lewis also testified regarding his involvement in the case. Trooper Lewis testified that he was the officer that initiated the traffic stop of Leonard's vehicle. Trooper Lewis stated that he did discuss with Leonard the process of obtaining contraband that may be concealed on her person. Specifically, the following testimony was elicited regarding the conversation between Trooper Lewis and Leonard:

MS. SCHUMAKER [assistant prosecutor]: What did you explain was the process, a, I guess I want to say, what options did you give to the Defendant?

TROOPER LEWIS: Basically at this point, Trooper Kuehne and myself were confident that there were, that both females were concealing contraband on their body. Typical, what we'll do is, if they cooperate and forfeit the contraband they have there, we'll submit it off to our crime lab, once we get the lab results back we put together a Grand Jury packet and send it off to the Prosecutor's office, let the Prosecutor's office present it to the Grand Jury and then we're under the impression that they send a, a summons or a subpoena to the person letting them know that they've been indicted and they need to appear for an arraignment.

MS. SCHUMAKER: Okay. So –

TROOPER LEWIS: The other option is, that's the first option, their option is they just voluntarily give it to us and we skip the whole process. So, I'm sorry, I may

have, I may have stepped on myself there. Let me explain it again. If they voluntarily give it to us, in return, we send it off to the crime lab, they leave, we'll submit it to the Prosecutor's office from there, let them indict them and go through the process that way. The other option is, if we feel like we have enough to take them back to the Post, we take them back to the Highway Patrol Post, call a supervisor, call the Prosecutor's office, see if we have enough to get a warrant, apply for a warrant and then go that route for a body cavity search.

MS. SCHUMAKER: Okay. And, was this what you explained to the Defendant?

TROOPER LEWIS: Yes.

* * *

MS. SCHUMAKER: Okay. And then after you applied for the warrant, then what would happen?

TROOPER LEWIS: Once we applied for the warrant, at this time our investigators would be involved, our OIS, Office of Investigative Services would come out, they would handle the actual writing of the warrant, getting the warrant approved and then they would take her to the hospital and have the warrant served there and have a doctor do a cavity search.

MS. SCHUMAKER: Okay. So, during that whole time the person would be in custody?

TROOPER LEWIS: Absolutely, yes.

MS. SCHUMAKER: Okay. So, when you offered these options, was this an option of to be released that evening or to be arrested?

TROOPER LEWIS: Right. If I'm in control I can release her. Once I get supervisors involved I can't guarantee that I could release her.

MS. SCHUMAKER: Okay. Now, you mentioned that, when you were talking, when you were talking with, you talked to her about the process of submission to the Prosecutor's office, what did you mean by that?

TROOPER LEWIS: Basically, my understanding is the way we've done it in other Courts is, once I get the dope, the crack, I'll submit it off to the crime lab. Our crime lab is about six to eight months behind right now. Once I get the lab results back I'll put together the lab results, the video, the case, any photos that I've taken, submit that to the Prosecutor's office, let them present it to the Grand Jury. Once they're, they're indicted, my understanding is that they'll either get a subpoena in the mail or a summons, something certified mail or someone will hand deliver them a subpoena, an Indictment and let them know when they're [sic] arraignment date is.

MS. SCHUMAKER: Do you have any control over what they do at that point?

TROOPER LEWIS: I don't.

MS. SCHUMAKER: At, after the Grand Jury indictment or presentation or indictment?

TROOPER LEWIS: I don't, no.

MS. SCHUMAKER: Okay. So, you are, you don't know for certain whether it's someone who, where there's a warrant issued for an arrest or whether it's a summons issued?

TROOPER LEWIS: Right. I'm, I'm not in control of that.

MS. SCHUMAKER: And, do you, have you ever been in control of that?

TROOPER LEWIS: No, I, basically just base it off where the county I work the most, Scioto County, and it's usually, they'll try to have a summons issued for them and then have them show up for an arraignment date, but I have no control over it, no.

MS. SCHUMAKER: Okay. So that's just based on that experience?

TROOPER LEWIS: Based on my experiences, yeah.

MS. SCHUMAKER: Okay. Alright. However, on that night, would you, would it be fair to say that your options to Ms. Leonard were turn over the drugs and you'll be indicted or be arrested?

TROOPER LEWIS: Correct.

{¶10}  On cross-examination, defense counsel questioned Trooper Lewis even more about the options explained to Leonard.

MR. CORNELY [defense counsel]: I guess I won't use that. Officer, when you are talking with both Ms. Leonard and [the passenger] about the, the deal that's going to be done, you tell them that their first option is they can be arrested or,

strike that. The first option is you'll go get a warrant, they'll be arrested and taken to Municipal Court, they'll have to bond themselves out, correct?

TROOPER LEWIS: Correct.

MR. CORNELY: Okay. And that the second option you give is that they could give you the drugs, you'll let them go, you'll make sure you have their information, you'll forward the case on to the Prosecutor's office and six or eight months later the drug results will come in?

TROOPER LEWIS: Yes.

* * *

MR. CORNELY: Oh, well, somebody says that they are going to, if you give us the stuff today the Court will get ahold of you and then tell you what to do to take care of this. Does that sound like something that would have been said?

TROOPER LEWIS: Something, yeah, one of us would have said that, probably, yes.

MR. CORNELY: Okay. And, at about twenty-two fifty-eight, after Ms. Leonard gives you the items, she asks and you say, the lab results will be six to eight months, you'll get something in the mail from the Ross County Common Pleas Court about what to do and where to be on this case?

TROOPER LEWIS: Yes, that was my understanding, that she'd get a summons in the mail that would advise her of her arraignment date.

* * *

MR. CORNELY: Your option two was we give you the drugs today, six to eight months later I will, they'll get back from the lab, you'll be indicted and a summons will be issued for you and you'll show up into Court?

TROOPER LEWIS: Basically, once everything's submitted to the Prosecutor's office and then they make a decision on, on what happens next, correct.

MR. CORNELY: Okay. But, if they were to ask you, they, you would have said yeah, that they, in fact you did, they're going to send you something in the mail, a summons, on when to show up in Court?

TROOPER LEWIS: I believed that was what would occur, yes, sir.

{¶11}  Leonard also testified at the suppression hearing. Leonard stated that the officers never gave *Miranda* warnings to her. Regarding her understanding of the options explained to her, Leonard testified as follows:

MS. LEONARD: The officer explained to me that he knew that we had drugs on us and he didn't care whether we go to jail or not but if we turned them in tonight we could go on our way tonight and that the Prosecutor would take it into consideration. If it's enough they would prosecute, if not, they wouldn't. If they decided to prosecute then I would receive a subpoena in the mail with a Court date and the process would start from there.

* * *

MR. CORNELY: Okay. And then if they came back positive for drugs the Prosecutor would seek an indictment?

MS. LEONARD: That I would receive a subpoena in the mail.

MR. CORNELY: Okay. And if you were indicted you would receive the subpoena or a paper in the mail telling you when to go to Court.

MS. LEONARD: That what the, yes, an indictment. I know he said subpoena.

MR. CORNELY: Alright. The subpoena you're talking about would be a letter telling you when to show up to Court?

MS. LEONARD: Yes.

MR. CORNELY: Okay. Did you ever receive anything in the mail telling you when to show up to Court?

MS. LEONARD: I did not and I'm still at the same address.

MR. CORNELY: Okay. And were you then arrested?

MS. LEONARD: That night?

MR. CORNELY: No. Later.

MS. LEONARD: Yes, I was.

{¶12}   At the conclusion of the suppression hearing, the trial court stated that the police promise that Leonard would not be arrested before arraignment was illusory and that the statements and actions of Leonard were not voluntary. However, the trial court invited the parties

to submit briefs on the issue of inevitable discovery. After reviewing briefs from the State and Leonard, the trial court eventually ruled that the doctrine of inevitable discovery did not apply. As a result, Leonard's motion to suppress was sustained, suppressing the admission and contraband in this case.

{¶13}  The State timely appealed the trial court's judgment pursuant to R.C. 2945.67.

## II. Assignments of Error

{¶14}  The State assigns the following errors for our review:

Assignment of Error I:

> THE TRIAL COURT ERRED IN GRANTING THE DEFENDANT-APPELLEE'S MOTION TO SUPPRESS BECAUSE BASED UPON THE TOTALITY OF THE CIRCUMSTANCES, THE DEFENDANT'S STATEMENTS, INCLUDING HER CONFESSION, REGARDING THE CONTRABAND ON HER PERSON WERE VOLUNTARY, NOT COERCED, THEREFORE NO VIOLATION OF ANY OF HER CONSTITUTIONAL RIGHTS OCCURRED.

Assignment of Error II:

> THE TRIAL COURT ERRED IN ITS DETERMINATION THAT THE DOCTRINE OF INEVITABLE DISCOVERY DOES NOT APPLY TO THIS CASE.

## III. Law and Analysis

{¶15}  Both of the State's assignments of error concern the trial court's judgment on the motion to suppress evidence. Appellate review of a motion to suppress presents a mixed question of law and fact. *State v. Gurley,* 2015-Ohio-5361, 54 N.E.3d 768, ¶ 16 (4th Dist.), citing *State v. Roberts,* 110 Ohio St.3d 71, 2006-Ohio-3665, 850 N.E.2d 1168, ¶ 100. At a suppression hearing, the trial court acts as the trier of fact and is in the best position to resolve factual questions and evaluate witness credibility. *Id.; State v. Burnside,* 100 Ohio St.3d 152, 2003-Ohio-5372, 797

N.E.2d 71, ¶ 8. Thus, when reviewing a ruling on a motion to suppress, we defer to the trial

court's findings of fact if they are supported by competent, credible evidence. *Gurley* at ¶ 16,

citing *State v. Landrum,* 137 Ohio App.3d 718, 722, 739 N.E.2d 1159 (4th Dist.2000). However,

"[a]ccepting those facts as true, we must independently determine whether the trial court reached

the correct legal conclusion in analyzing the facts of the case." *Id.,* citing *Roberts* at ¶ 100.

### A. Voluntariness of Confession

{¶16}   In its first assignment of error, the State contends that the trial court erred by

suppressing Leonard's confession and the drugs that were obtained as a result of the confession.

In particular, the State argues that Leonard voluntarily confessed to having contraband on her

person, and that the confession was not a result of police coercion.

{¶17}   The Fifth Amendment to the United States Constitution and Article I, Section 10

of the Ohio Constitution guarantee that no person in any criminal case shall be compelled to be a

witness against himself. The Fifth Amendment, as well as the Due Process Clause of the

Fourteenth Amendment, protects against the concern that coerced confessions are inherently

untrustworthy. *Dickerson v. United States*, 530 U.S. 428, 433, 120 S.Ct. 2326, 147 L.Ed.2d 405

(2000). "A free and voluntary confession is deserving of the highest credit, because it is

presumed to flow from the strongest sense of guilt * * * but a confession forced from the mind

by the flattery of hope, or by the torture of fear, comes in so questionable a shape * * * that no

credit ought to be given to it." (Quotation omitted.) *Id.*

{¶18}   "Voluntariness of a confession is determined based on the totality of the

circumstances." *State v. Perez*, 124 Ohio St.3d 122, 2009-Ohio-6179, 920 N.E.2d 104, ¶ 71,

citing *State v. Edwards*, 49 Ohio St.2d 31, 358 N.E.2d 1051 (1976), paragraph two of the

syllabus, *vacated on other grounds*, 438 U.S. 911, 98 S.Ct. 3147, 57 L.Ed.2d 1155 (1978).

"However, the use of an inherently coercive tactic by police is a prerequisite to a finding of involuntariness." *Id*., citing *Colorado v. Connelly*, 479 U.S. 157, 167, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). "Hence, we need not assess the totality of the circumstances unless we first find that [the Troopers] used a coercive tactic * * *." *Id*.

{¶19}  " 'To support a determination that a confession was coerced, the evidence must establish that: (1) the police activity was objectively coercive; (2) the coercion in question was sufficient to overbear defendant's will; and (3) defendant's will was, in fact, overborne as a result of the coercive police activity.' " *State v. Humphrey*, 4th Dist. Ross No. 10CA3150, 2010-Ohio-5950, ¶ 18, *vacated on other grounds*, 128 Ohio St.3d 397, 2011-Ohio-1426, 944 N.E.2d 1172, quoting *United States v. Rigsby*, 943 F.2d 631, 635 (6th Cir.1991).

> The line to be drawn between permissible police conduct and conduct deemed to induce or tend to induce an involuntary statement does not depend upon the bare language of inducement but rather upon *the nature of the benefit to be derived by a defendant if he speaks the truth,* as represented by the police. * * *
> When the benefit pointed out by the police to a suspect is merely that which flows naturally from a truthful and honest course of conduct, we can perceive nothing improper in such police activity. On the other hand, if in addition to the foregoing benefit, or in the place thereof, *the defendant is given to understand that he might reasonably expect benefits in the nature of more lenient treatment at the hands of the police, prosecution or court in consideration of making a statement, even a truthful one, such motivation is deemed to render the statement involuntary and inadmissible.* The offer or promise of such benefit need not be expressed, but may be implied from equivocal language not otherwise made clear.

(Emphasis sic.) (Quotations omitted.) *State v. Arrington*, 14 Ohio App.3d 111, 115, 470 N.E.2d 211 (6th Dist.1984).

{¶20} We acknowledge that " 'a promise of lenient treatment or of immediate release may be so attractive as to render a confession involuntary.' " *Humphrey* at ¶ 20, quoting *United States v. Wrice*, 954 F.2d 406, 411 (6th Cir.1992). "But we also recognize that promises of leniency may be coercive *only* if they are broken or illusory." (Emphasis sic.) *State v. Elliott*, 4th Dist. Washington No. 10CA21, 2011-Ohio-1746, ¶ 47, citing *Humphrey* at ¶ 20, in turn citing *United States v. Johnson*, 351 F.3d 254, 262 (6th Cir.2003). " '[F]alse promises made by police to a criminal suspect that he can obtain lenient treatment in exchange for waiving his Fifth Amendment privilege so undermines the suspect's capacity for self-determination that his election to waive the right and incriminate himself in criminal conduct is fatally impaired. * * * The simple result is that officers must avoid such promises, which are not proper tools of investigation.' " *State v. Jackson*, 2d Dist. Greene No. 02CA0001, 2002-Ohio-4680, ¶ 40, quoting *State v. Petitjean*, 140 Ohio App.3d 517, 534, 748 N.E.2d 133 (2d Dist.2000).

{¶21} In the case sub judice, the police promised Leonard that if she turned over the drugs they believed to be on her person she would not be arrested that night and she would not be subject to the more invasive hospital search. The officers were also clear that in the event the suspected contraband tested positive for drugs, the case would ultimately be in the hands of the prosecutor. Moreover, while Trooper Lewis testified that he told Leonard she would receive a summons if she turned over the suspected contraband, the video evidence shows that the officers also told Leonard that the matter will be turned over to the prosecutor's office who will take it from there, or that the prosecutor will make a decision as to what to do. With this record in mind, we conclude that the promise made by law enforcement was fulfilled. Leonard was not arrested

or searched on the night of incident. Rather, Leonard was arrested six months later after the contraband was tested, the matter turned over to the prosecutor, and an indictment secured in the Common Pleas Court. Therefore, because the promise was not broken or illusory, it was not coercive in nature. We further note that the benefit pointed out by the police to Leonard (no immediate arrest, no search, submission to prosecutor) was one that flowed naturally from a truthful and honest course of conduct.

{¶22} Because the troopers did not engage in coercive tactics, we need not conduct a totality-of-the-circumstance analysis. *See Elliot* at ¶ 49, citing *Perez*, 124 Ohio St.3d 122, 2009-Ohio-6179, 920 N.E.2d 104, at ¶ 71. Accordingly, we sustain the State's first assignment of error and reverse the judgment of the trial court.

### B. The State's Second Assignment of Error is Moot

{¶23} In its second assignment of error, the State contends that even if the statements made by Leonard violated the Fifth Amendment, the troopers through lawful means in this case would have inevitably discovered the contraband. However, because we have sustained the State's first assignment of error, the judgment shall be reversed. Consequently, the second assignment of error is moot and we decline to address it. *See* App.R. 12(A)(1)(c).

### IV. Conclusion

{¶24} Based on the foregoing, we conclude that the trial court erred by granting Leonard's motion to suppress. The judgment of the trial court is reversed, and this matter remanded for further proceedings.

JUDGMENT REVERSED AND CAUSE REMANDED.

Hoover, J., dissenting:

{¶25} I respectfully dissent from the per curiam opinion and conclude that the trial court did not err in granting Leonard's motion to suppress. Accordingly, I would overrule both of the State's assignments of error and affirm the judgment of the trial court.

{¶26} With regards to the State's first assignment of error, I would conclude that the promise made by the police to elicit the confession was coercive. The police promised Leonard that if she turned over the drugs they believed to be on her person they would allow her to avoid arrest prior to arraignment. In other words, the promise was for (1) immediate release, (2) future indictment, and (3) court summons to answer the charge. Two of the three conditions were met. However, in place of the promised summons Leonard was arrested on a warrant accompanying her secret indictment. Thus, the promise was broken, making it coercive.

{¶27} The per curium opinion avoids finding that the promise was broken by explaining that "the video evidence shows that the officers also told Leonard that the matter will be turned over to the prosecutor's office who will take it from there, or that the prosecutor will make a decision as to what to do." However, it is clear that Trooper Lewis testified that he told Leonard she would receive a summons if she turned over the suspected contraband. Leonard did not receive a summons; instead, she was arrested. Thus, I would find that the promise was broken; and police conduct was indeed coercive.

{¶28} Having determined that the police conduct was coercive, I must next engage in a totality of the circumstances analysis to determine the voluntariness of the confession. A totality of the circumstances analysis requires consideration of the defendant's "age, mentality, and prior criminal experience * * *; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement." *State v.*

*Edwards*, 49 Ohio St.2d 31, 358 N.E.2d 1051 (1976), paragraph two of the syllabus, *vacated on other grounds*, 438 U.S. 911, 98 S.Ct. 3147, 57 L.Ed.2d 1155 (1978)

{¶29}  Here, Leonard was 42 years old at the time of the incident. There was no evidence that her mentality was anything but normal; nor was there evidence that she was of below average intelligence or suffered from a disability. Leonard did indicate to the police during the traffic stop that she did have experience in the criminal justice system; but there is nothing in the record to indicate Leonard's full criminal history.

{¶30}  Regarding the interrogation, there was conflicting evidence concerning whether Leonard was read her *Miranda* rights. The trial court determined that the *Miranda* warnings were given, but questioned the quality of *Miranda* noting the lack of a written waiver and the circumstance that *Miranda* was given on the side of a major roadway. Leonard was also interrogated while along the side of the roadway and while in back of the police cruiser. Clearly, Leonard was in custody of the police and could not leave during the interrogation. After reviewing the video of the interrogation, it does not appear that the interrogation was abnormally long.

{¶31}  As for inducement, I have already determined that the police engaged in coercive tactics by making promises of leniency that were broken. I also note that the two officers teamed up in their negotiations with Leonard, with Trooper Kuehne suggesting to Leonard that the option explained by his partner was a good deal.

{¶32}  Considering the totality of the circumstances, I conclude that the police engaged in coercive activity that overbore Leonard's will and rendered her waiver of rights involuntary. Particularly concerning was the broken promise of lenient treatment, and the fact that Leonard

was not free to leave during the interrogation. Accordingly, I would overrule the State's first assignment of error.

{¶33} My determination of the first assignment of error necessitates that I address the State's second assignment of error. In its second assignment of error, the State contends that had Leonard not confessed and handed over the contraband they would have obtained a search warrant and found the drugs anyways – thus relying upon the inevitable discovery doctrine.

{¶34} The inevitable discovery doctrine allows evidence that was obtained illegally to be admitted if it would have inevitably been obtained lawfully. *State v. Bradford,* 4th Dist. Adams No. 09CA880, 2010–Ohio–1784, ¶ 54, citing *Nix v. Williams,* 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984). This exception was adopted by the Ohio Supreme Court in *State v. Perkins,* 18 Ohio St.3d 193, 480 N.E.2d 763 (1985). It is the State's "burden to show within a reasonable probability that police officials would have discovered the derivative evidence apart from the unlawful conduct." *Perkins* at 196. The State can establish the inevitable discovery of an unconstitutionally seized item by showing (1) "prior to the misconduct, authorities were actively pursuing an alternate line of investigation that would have led to discovery of the item"; or (2) "they would have subsequently discovered the item by virtue of some standardized procedure or established routine." *Bradford* at ¶ 55.

{¶35} In the case sub judice, I am not persuaded by the State's argument that the inevitable discovery doctrine would apply because the officers could have obtained a warrant had they sought one. This Court has previously rejected this exact argument and held that the inevitable discovery doctrine should not apply in such a way as to encourage unconstitutional shortcuts by police. *State v. Coyle*, 4th Dist. Ross No. 99CA2480, 2000 WL 283073, *5 (Mar. 15, 2000). "The [S]tate's purported justification threatens core Fourth Amendment values by

sanctioning an unconstitutional shortcut, *i.e.* bodily intrusion without a warrant or exigent circumstances. To apply the inevitable discovery doctrine whenever police *could* have obtained a warrant, yet chose *not* to, would essentially eliminate the warrant requirement and encourage police to proceed without a neutral and detached magistrate's probable cause determination." (Emphasis sic.) *Id*. at *6. "We are unwilling to apply the inevitable discovery doctrine in a manner that would uphold a warrantless and non-exigent search whenever a court makes a *post hoc* determination that probable cause existed." *Id*.

{¶36} I also disagree with the State's contention that this case is similar to *State v. Cundiff*, 10th Dist. Franklin No. 12AP-483, 2013-Ohio-1806. In *Cundiff*, buccal swabs were obtained from a rape suspect without a warrant. *Id*. at ¶ 14. The Tenth District held that the inevitable discovery doctrine applied, and affirmed the trial court's denial of appellant's motion to suppress. *Id*. at ¶¶ 20-24. The *Cundiff* decision, however, expressly limited its holding to "the facts presented in this appeal". *Id*. at ¶ 21. The *Cundiff* decision noted that "the DNA evidence would have been (1) available and (2) in the same condition at a later date as it would have been when the buccal swab was taken * * *." *Id*. It then concluded that: "Presumably, the [S]tate would have obtained the same results if the trial court granted the motion to suppress and the [S]tate obtained new buccal swabs pursuant to a search warrant." *Id*. at ¶ 21. Finally, the court noted "this sort of case, involving possible rape or sexual contact, is the type of investigation where a DNA evidence is routinely gathered from suspects" and that "[u]nder similar circumstances, courts in other jurisdictions have applied the inevitable-discovery doctrine * * *." *Id*. at ¶ 20. Simply put, *Cundiff* is wholly inapplicable here, because it presents a unique set of facts and issues distinct from the case sub judice.

{¶37} Based on the foregoing, I would conclude that the trial court did not err in

determining that the inevitable discovery doctrine did not apply in the case sub judice; and would overrule the State's second assignment of error.

{¶38}  Having determined that neither of the State's assignments of error is meritorious, I would affirm the judgment of the trial court.

# **JUDGMENT ENTRY**

It is ordered that the JUDGMENT IS REVERSED AND CAUSE IS REMANDED. Appellee shall pay the costs herein taxed.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Ross County Court of Common Pleas to carry this judgment into execution.

IF A STAY OF EXECUTION OF SENTENCE AND RELEASE UPON BAIL HAS BEEN PREVIOUSLY GRANTED BY THE TRIAL COURT OR THIS COURT, it is temporarily continued for a period not to exceed sixty days upon the bail previously posted. The purpose of a continued stay is to allow Appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of proceedings in that court. If a stay is continued by this entry, it will terminate at the earlier of the expiration of the sixty day period, or the failure of the Appellant to file a notice of appeal with the Supreme Court of Ohio in the forty-five day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio. Additionally, if the Supreme Court of Ohio dismisses the appeal prior to expiration of sixty days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Abele, J., and McFarland, J.: Concur in Judgment and Opinion.
Hoover, J.: Dissents with Dissenting Opinion.

For the Court,


By: _____
               Peter Abele, Judge


By: _____
               Matthew W. McFarland, Judge


By: _____
               Marie Hoover, Judge

## **NOTICE TO COUNSEL**

Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.